## Seaway Shopping Center Corporation v. The Grand Union Stores, Inc., of Vermont, and The Grand Union Company

[315 A.2d 483]

No. 3-73

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed February 5, 1974

*James D. Foley, Esq.,* of *Yandell, Page & Archer,* Burlington, for Plaintiff.

*Wilson, Curtis, Bryan, Quinn & Jenkins,* Burlington, for Defendants.

**Shangraw, C.J.** This is an appeal from a judgment entered in a civil action tried by the Chittenden County Court on December 6, 1972. Jury trial was waived and following a hearing by the court plaintiff was awarded damages in the amount of $14,839.05 and its costs. A judgment for this amount followed, and the defendants have appealed therefrom.

Plaintiff, a Vermont corporation, owns and operates the Seaway Shopping Center in South Burlington, Vermont. Its principal stockholder and officer is Thomas Farrell, who developed the shopping center.

The Grand Union Stores, Inc., of Vermont, is also a Vermont corporation, and a wholly owned subsidiary of The Grand Union Company. The Grand Union Company is a Delaware corporation with its principal office in East Paterson, New Jersey. The Grand Union Company is a guarantor of the performance of its subsidiary company under the lease here in question.

For the purposes of this opinion, Seaway Shopping Center is hereinafter referred to as "Seaway", The Grand Union Stores, Inc., of Vermont, as "Tenant", and The Grand Union Company as "Parent Company".

The original lease, here in question, was between Thomas Farrell and the above Tenant. The Parent Company was guarantor of the Tenant. The lease was subsequently assigned by Farrell to Seaway. Its terms are not in dispute.

Without reciting verbatim all of the pertinent provisions of the lease, the court determined under finding No. 5 that it provided, in substance, as follows:

(a) That the Landlord would maintain the surface of the parking area, rights of way, curb-cuts, approaches and sidewalks in good condition.

(b) That if the Landlord failed to carry out any of its obligations, the Tenant might, after reasonable notice or without notice if in the Tenant's judgment an emergency should exist, perform the obligation at the expense of the Landlord.

(c) That if Tenant did so, it would be entitled to reimbursement from the Landlord, and could apply the claim against subsequent rent installments.

(d) That the Landlord should also mark and reline the parking areas as often as necessary.

(e) That notices or demands under the lease should be given by each party to the other by mail, to the addresses therein set forth.

The trial court continued with the following findings.

6. It is undisputed, and we find, that the Tenant in July 1971, caused a substantial part of the parking area adjacent to its store premises to be repaired and repaved, and subsequently remarked. The cost of the paving was

$14,050.00, and of the remarking $903.15, both costs being reasonable.

7. It is also conceded, and found, that Tenant made withholdings from its rent as follows:

| | |
|---|---|
| January 1, 1972 | $2,500.00 |
| February 1, 1972 | 2,500.00 |
| March 1, 1972 | 2,500.00 |
| April 1, 1972 | 2,500.00 |
| May 1, 1972 | 2,500.00 |
| June 1, 1972 | 2,453.15 |

8. It is virtually, if not actually, conceded, and we find, that the remarking in question was required and necessary, whether or not the repaving was, and we find that the deduction of $903.15 by Tenant was justified and is an allowable reduction of plaintiff's claim.

9. Since the rental obligation itself is not in question, the central issue here involved is the condition of the parking lot before the repaving was done, i.e. whether it was in "good condition" as required by the lease. We find that it was, and that the repaving by the Tenant was not justified. Additionally, no notice of the repaving was given to the Landlord, the notice which was given referring only to "repair." *(Def. Ex. T)*

10. Over the course of six years prior to the repaving, Tenant had from time to time notified Seaway of the recurrent need for repairs to the lot, and Seaway had made them, presumably to the satisfaction of Tenant, since the non-performance clause had not previously been invoked.

11. When repairs were needed, Seaway had an arrangement with one Armand Pare and one Rene Barsalou to make them, using their equipment and hot mix (or cold patch in winter) purchased from local suppliers.

12. The cost of these repairs to Seaway were as follows: 1966, $760.65; 1967, $20.15; 1968, $670.09; 1969, $232.01; 1970, $469.91; and 1971, $1,835.91. The total is $3,968.72, almost half of which was just before the repaving in question.

13. Mr. Farrell testified that the repaving was done by Tenant, not because of necessity, but because it desired

to give the premises a "new look" and to upgrade the store to meet growing competition. We so find, for the following reasons:

(a) By letter of May 5, 1970, the parent company advised Seaway (*Def. Ex. L*) that the parking area was badly in need of repair, "creating a very shabby appearance in comparison to the other Shopping Centers in the area."

(b) It then, in August, 1970, proceeded to get an estimate of the cost of repaving from L. M. Pike & Son, Inc. (*Pl. Ex. 2, p. 4*), even though it did not proceed with the work.

(c) On June 25, 1971, in a telephone conversation with Farrell, Mr. Hayes, vice-president for the real estate of the parent company (which handled all these matters completely, without reference to its subsidiary), asked Seaway to pay half of the cost of repaving, to upgrade the store to meet competition. Mr. Farrell refused, advising Hayes that substantial repairs had already been made and more were in process.

(d) At that time, a second quotation for repaving had already been obtained by defendants, and another was in the process.

(e) We are unable to find, and defendants' evidence could not make clear, who made the decision to repave. Notice was mailed July 1, 1971, although it did not specify that repaving was to be done, referring only to repairs. This notice came from Mr. Charles Bailey, assistant maintenance supervisor for the parent company. The following day he accepted the low quote for the work, and it proceeded.

(f) When Mr. Bailey gave this notice and accepted the quote, he did not know repairs had been made, was unaware of the then condition of the lot, and had had no communication from local officials of the Tenant about the repairs.

(g) Mr. Bailey testified he did not know who in the chain of command made the decision to repave. He thought it might have been the "legal department." A representative of the legal department was present

throughout the trial, but did not testify. The vagueness of this whole line of testimony as to individual decision-making within the corporate structure tends to reinforce the conclusion that the reasons for repaving were other than as stated in the formal notice.

14. The defendants, although entitled to deduct the sum of 903.15 from the rent, were not entitled to deduct the further sum of $14,050.00. Plaintiff is entitled to recover from defendants that sum, with interest to date in the amount of $789.05, for a total of $14,839.05, plus its taxable costs.

In its conclusions the court, in part, stated:

> No substantial legal questions are here presented. As agreed, by the parties, the main issue involved is one of fact, whether the parking lot in question was in good condition under the terms of the lease when the repaving was done, or in such bad condition, unremedied by the landlord after tenant's request, that repaving was necessary. Strengthened by the information that tenant's responsible officials did not know of, or take into consideration, the substantial repairs which landlord had made, we have concluded that the repaving was not necessary, but was done for purposes of "upgrading" to meet competition, a worthy motive but not the landlord's responsibility under the lease.

The issues raised by the defendants on appeal are primarily challenges to the findings of fact made by the trial court which they claim are clearly erroneous. The standard by which such a challenge is tested is stated in V.R.C.P. 52(a) thus:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses and the weight of the evidence.

The above Vermont rule is similar to Rule 52(a) of the Federal Rules of Civil Procedure. Defendants argue that this Court should not follow the long history of Vermont case law, but should adopt a new standard now used by the Federal Courts. It is claimed that under the Federal test, this

Court should consider all of the evidence when reviewing findings of fact and not only that evidence which would be most favorable to the prevailing party in order to determine whether or not the findings are "clearly erroneous". The defendants contend that the crucial findings are clearly erroneous.

▮ This Court has interpreted the clearly erroneous test to require it to "take the evidence in the light most favorable to the prevailing parties, excluding the effect of modifying evidence." *Green Mountain Marble Co.* v. *Highway Board,* 130 Vt. 455, 457, 296 A.2d 198 (1972). Our test, as stated in *Armstrong* v. *Hanover Ins. Co.,* 130 Vt. 182, 185, 289 A.2d 669 (1972), appears as follows:

> The prescribed law of this state is that findings must stand if there is any credible evidence which fairly and reasonably supports them, and this Court must construe them so as to support the judgment, if possible, and further, that the weight of the evidence, the credibility of the witnesses and the persuasive effect of the testimony is for the sole determination of the trier of fact.

This Court thus uses the same interpretation of V.R.C.P. 52(a) as it did under the previous statutory requirement found in 12 V.S.A. § 2385.

In essence, the defendants urge that this Court should reconsider the case of *Green Mountain Marble Co.* v. *Highway Board, supra,* and follow the Federal practice of looking to the evidence in its entirety on appeal. They cite *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 394–95 (1948), as a definitive Federal case on the "clearly erroneous" test. That opinion, in part, states:

> [F]indings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses . . . . A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed.

When findings are challenged on appeal, it is the recognized duty of this Court to search such portions of the record as are called to our attention, in order to determine whether or not there is substantial evidence to support them. We must read the evidence in support of the findings if reasonably possible, "when considered as a whole." *Little* v. *Little*, 124 Vt. 178, 182, 200 A.2d 276 (1964).

In construing Federal Rule 52(a), the *Gypsum* case, *supra*, in effect held that a reviewing court should consider the "entire evidence". Under our Vermont Rule 52(a), it was held in the *Little* case, *supra*, that the evidence should be "considered as a whole." This leaves very little difference in result between the Federal rule and our case law as applied to our Vermont rule, which we now reaffirm. We are not inclined to give a different meaning to V.R.C.P. 52(a) than has been previously enunciated by this Court in our case law.

The central issue is whether the parking lot in question was in "good condition" after it had been repaired by Seaway in June, 1971. It is the contention of the Tenant that the court's finding that the lot was in "good condition" prior to repaving is clearly erroneous and that Seaway's evidence as to the good condition of the parking lot after repairs had been made by Seaway was inclusive and equivocal.

A number of witnesses were called by the Tenant who testified that prior to the repairs there were depressions, ruts, cracks, holes and soft spots in the parking lot and that the repairs made by Seaway in 1971 at a cost of $1,835.51 were faulty. Also, notwithstanding the repairs, there were six or seven clay spots which, at time of repaving, had to be dug out at a maximum cost of $700. The Tenant introduced other evidence that following the repairs made by Seaway the general condition of the lot was poor and needed resurfacing.

To the contrary, Seaway's evidence in the transcript reveals that the repairs made in June, 1971, were done in a good and workmanlike manner, that resurfacing was not necessary, and that following such repairs the parking lot was in good condition.

Thus, the controversial issue relating to the condition of the parking lot at the time of repaving was left to the court for resolution. Finding No. 9 that the parking lot was in good condition prior to repaving and that the repaving by the Tenant was not justified is amply supported by the evidence.

The Tenant next claims that the trial court's finding of fact that the repaving was done by Tenant, not because of necessity, but because it desired to give the premises a "new look" and to upgrade the store to meet growing competition is clearly erroneous. On the contrary, Seaway urges that the trial court's finding of fact, No. 13, determining that the repaving was done by the Tenant in its desire to give the premises a "new look" is substantially supported by the record.

The question as to whether or not the Tenant was interested in obtaining a "new look" is not pertinent to the issue as to whether or not the parking lot was in "good condition" at the time of the repaving job done by the Tenant.

By finding No. 13 the court determined that ". . . the repaving was done by Tenant, not because of necessity, but because it desired to give the premises a 'new look' and to upgrade the store to meet growing competition. . . ." This finding is reinforced by subparagraphs thereof. In addition to the foregoing finding, and in support thereof, we note the following testimony of the witness, Charles J. Bailey, an employee of the Tenant.

Q. It's not necessary to have an even blacktop surface, is it?

A. It would be nicer than holes, sir. Having a good parking lot is good advertising.

We find no basis in the record for disturbing finding No. 13. We are bound to confirm this result unless, as a matter of law, it is unsupportable. *Villeneuve* v. *Commissioner of Taxes*, 128 Vt. 356, 357, 264 A.2d 774 (1970), citing *Forslund* v. *Cookman*, 125 Vt. 112, 114, 211 A.2d 190 (1965). The prescribed law of this jurisdiction is that findings must stand if there is any credible evidence which fairly and reasonably supports them. *Largess* v. *Tatem*, 130 Vt. 271, 280, 291 A.2d 398 (1972).

The issue was raised below as to whether, under the terms of the lease, the Tenant gave "reasonable notice" in writing to Seaway that the parking lot needed repaving before the Tenant proceeded to do so. This became a controverted issue. The trial court found that the notice given referred only to "repair".

As stated in the findings and conclusions, the court below determined that the parking lot was in good condition by reason of the repairs made by Seaway and that the repaving done shortly thereafter by the Tenant was not necessary. This is the critical and controlling issue upon which the judgment is predicated. Therefor, the above referred to notice, or lack thereof, becomes immaterial in disposing of this appeal, and requires no consideration by this Court.

*Judgment affirmed.*