In re Grievance of Ruth Muzzy

[449 A.2d 970]

No. 364-80

Present: Barney, C.J., Billings, Hill and Underwood, JJ., and Shangraw, C.J. (Ret.), Specially Assigned

Opinion Filed July 15, 1982

*Michael R. Zimmerman* and *Putter & Unger* (On the Brief), Montpelier, for Plaintiff.

*John J. Easton, Jr.,* Attorney General, *John Scott Cameron,*

Assistant Attorney General, and *Marilyn Skoglund,* Special Assistant Attorney General, Montpelier, for Defendant.

**Underwood, J.** The grievant appeals an order of the Vermont Labor Relations Board which found that she was dismissed for just cause from her job as a typist in the Secretary of State's office. The Board's order relies on two novel principles of uncertain origin to produce its result. Because the principles used are legally erroneous, we reverse and remand.

The grievant was hired as a Typist B in the office of the Secretary of State in December of 1970. Nine years later, she received two consecutive unsatisfactory performance evaluations, the first she had ever received. She attributes this drop in performance to two factors. First, she claims that the quantity of the work she had to perform increased over the years. Of even greater consequence, she says, was a qualitative change in the nature of her responsibilities.

According to the job description, the work of a Typist B is characterized "by the general emphasis on clerical rather than secretarial or supervisory duties and the absence of any appreciable administrative duties." The grievant maintains that when a new Secretary of State took office in January of 1977, her duties were increased beyond the scope of a Typist B and she was required to assume sole responsibility for functions previously performed by an assistant secretary of state. Those duties included making decisions about trade name and corporate name availability, and processing applications therefor, in addition to handling corporate registrations and dissolutions, processing writs, and answering mail and telephone inquiries.

Apparently unable to adapt to the increased scope and volume of work, the claimant was told that she "inconsistently meets job requirements" in a performance evaluation covering the period from July 1978 to July 1979. When her next performance evaluation, covering the period from August 1979 through December 1979, reached the same result, she was placed in a three-month warning period which was to run from January through March 31, 1980. She was warned that if her performance during that period did not rise to the level

of "consistently meets job requirements" she would be dismissed.

Her supervisor "was of the opinion" that the unsatisfactory performance was continuing, according to the Board's findings, and the record contains memoranda written by the supervisor during the warning period chronicling the grievant's errors. Almost all of the specific errors cited in the various memoranda, however, predate the warning period. Also during the warning period, the grievant began experiencing unusual physical symptoms. Hospitalization during the last days of her warning period resulted in the discovery that she was a diabetic. Even though the warning period had not run, a decision was taken to dismiss her. On the advice of the Personnel Department, notice of that decision was mailed to the grievant at her hospital bed on March 28, 1980.

The Board sustained the grievant's dismissal, and used the occasion to announce two new principles of law which we have not encountered elsewhere. These principles both rest on a purported distinction between a dismissal for misconduct, and a dismissal for nonperformance. The Board's first innovation was to adopt an appellate standard of review for dismissals for nonperformance, and declare that the State's action would be upheld if it could show "substantial evidence" of just cause to dismiss, while hewing to the customary "preponderance of the evidence" standard for dismissals for misconduct. Secondly, in ruling that the progressive discipline provisions of the collective bargaining agreement between the State and its employees do not apply to dismissals for nonperformance, the Board ignored the plain meaning of a contract negotiated by the State and its employees, and turned instead to the *Rules and Regulations for Personnel Administration*, which were unilaterally promulgated by the State and predate the collective bargaining agreement, to limit and interpret the contract.

The grievant appeals from the Board's order, attacking both the legal innovations it contains, and certain deficiencies in its findings. Those deficiencies include (a) the Board's mere recitation of the supervisor's opinion that the grievant had performed unsatisfactorily during the warning period; and (b) the absence of any independent finding by the Board,

after a sifting of the conflicting evidence, that the deficiencies continued. She seeks reinstatement, back pay and other benefits.

■ The Board has jurisdiction to "hear and make final determination" of employee grievances. 3 V.S.A. § 926. "The extent of its jurisdiction in grievance proceedings is limited by the definition of the term 'grievance' in 3 V.S.A. § 902(14)," but does extend to an employee's complaint that her dismissal violated the collective bargaining agreement between the State and its workers. *In re Stacey*, 138 Vt. 68, 70, 411 A.2d 1359, 1360 (1980). See also *In re Harrison*, 141 Vt. 215, 220, 446 A.2d 366, 368 (1982). The employee here claims that her dismissal violated the collective bargaining agreement in two respects. First, it was without just cause. Secondly, she was dismissed without prior resort to the less onerous sanctions contained in the progressive discipline provisions of the contract.

■ The Board's function in addressing both issues is identical. "In grievance proceedings, the Board acts as a quasi-judicial body, determining questions of law and fact . . . ." *In re Brooks*, 135 Vt. 563, 565, 382 A.2d 204, 206 (1977). Our review of the Board's performance with respect to both issues convinces us that it has used fallacious legal principles to avoid its duty to find the facts.

We turn first to the issue of "just cause."

## I.

■■ "The objective of a 'just cause' clause in a collective bargaining agreement is to remove from the employer the right to fire employees arbitrarily." *In re Harrison, supra*, 141 Vt. at 220, 446 A.2d at 368. As the Board's opinion acknowledges, "Just cause means some substantial shortcoming detrimental to the employer's interests which the law and sound public opinion recognize as a good cause for dismissal." *In re Gage*, 137 Vt. 16, 18, 398 A.2d 297, 298 (1979).

[A] discharge may be upheld as one for "cause" only if it meets two criteria of reasonableness: one that it is reasonable to discharge employees because of certain

conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be ground for discharge.

*In re Brooks, supra,* 135 Vt. at 568, 382 A.2d at 207–08.

The Board found both criteria met in the present case: "Not only did Grievant's continuing performance deficiencies constitute a substantial shortcoming detrimental to the State's interest, but Grievant was given ample notice of the types of performance deficiencies which could result in her dismissal." The Board's opinion, however, is defective as to both issues.

## A.

The Board's conclusion that the grievant's shortcomings constituted conduct for which it would be reasonable to dismiss her depends on an erroneous standard of evidence. The Board stated:

> Where no due process violations are evident, we will, in examining the merits of a dismissal for performance reasons, give considerable deference to the evaluator(s). The answer to the essential question of whether an employee's actions or inactions constitute a "substantial shortcoming detrimental to the employer's interests" is predicated on the State's ability to establish that fact not by a preponderance of the evidence (as would be required in a case of dismissal for misconduct, cf. *Grievance of Robert DeForge,* 3 VLRB 204 (1980) and *Grievance of Peter Carlson,* 3 VLRB 303 (1980)), but by substantial evidence. It is then necessary for the grievant to rebut the facts and reasons given by the State to a degree sufficient to discredit and diminish the State's case to one without substantial evidence of cause.

This misstatement of the appropriate standard of evidence in a de novo hearing indicates the Board's continuing inability to comprehend its proper role. See, e.g., *In re Harrison, supra,* 141 Vt. at 219, 446 A.2d at 367; *In re Carlson,* 140 Vt. 555, 560, 442 A.2d 57, 60 (1982); *In re Gage, supra,* 137 Vt. at 19, 398 A.2d at 299; *In re Brooks, supra,* 135 Vt. at 570–71, 382 A.2d at 209. The Board has strayed from its

statutory function and from the contract it is supposed to construe by applying an appellate standard of review to resolve the issues before it.

The evidentiary standard adopted by the Board is not for a finder of fact, but for appellate review of facts found by an administrative body.

> The substantial evidence rule (which with very few exceptions is the standard for the review of administrative fact finding when the review is on a hearing record) is analogous to appellate review of judgments predicated on jury verdicts. . . . In essence, the substantial evidence rule sanctions rejection of administrative findings only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion. The rule does not permit the rejection of agency findings simply because a reasonable mind *might* have arrived at a contrary conclusion. The purpose of the rule is the protection of the integrity and autonomy of the administrative process as well as deference to the agency's expertise and experience.

5 B. Mezines, J. Stein & J. Gruff, Administrative Law § 51.01, at 51-17 et seq. (1982); see also 4 K. Davis, Administrative Law Treatise § 29.02 (1958).

■ Our description of the standard we use to review administrative findings has not been phrased in terms of the substantial evidence rule. Rather, we have stated, "We will not disturb findings made by an administrative body such as this Board absent a showing that the findings were clearly erroneous." *In re Young,* 134 Vt. 569, 570, 367 A.2d 665, 666 (1976). See also *In re McGrath,* 138 Vt. 77, 82, 411 A.2d 1362, 1365 (1980). This difference, however, is more semantic than substantive. As we have had occasion to note, the substantial evidence rule "differs little, if at all, from the 'clearly erroneous' test." *Green Mountain Power Corp.* v. *Commissioner of Labor and Industry,* 136 Vt. 15, 21, 383 A.2d 1046, 1050 (1978).

■ "The prescribed law of this jurisdiction is that findings must stand if there is any credible evidence which fairly and reasonably supports them." *Seaway Shopping.*

*Center Corp.* v. *Grand Union Stores, Inc.,* 132 Vt. 111, 118, 315 A.2d 483, 486 (1974). Even though the evidence may appear to us, on the basis of the cold record, to preponderate against the findings of the trier of fact, we will not reverse, *Rogers* v. *W. T. Grant Co.,* 132 Vt. 485, 489, 321 A.2d 54, 58 (1974), so long as the finding is supported by a quantity of evidence which is "more than a mere scintilla." *Green Mountain Power Corp.* v. *Commissioner of Labor and Industry, supra,* 136 Vt. at 21, 383 A.2d at 1049 (quoting *Universal Camera Corp.* v. *NLRB,* 340 U.S. 474, 477 (1951).

This appellate mode of review, however, is not for the Board to use in deciding grievances in a de novo proceeding. It does not act there as an appellate tribunal reviewing the findings of a detached and impartial finder of fact. Rather, it is supposed to be the detached and impartial finder of fact. By adopting the substantial evidence rule, however, it abandoned neutrality and tilted toward the State, thereby depriving the grievant of due process. "As a public administrative body, the Board has only such adjudicatory jurisdiction as is conferred on it by statute." *In re Harrison, supra,* 141 Vt. at 219, 446 A.2d at 367. 3 V.S.A. § 926 gives the Board jurisdiction to "hear and make final determination on the grievances of all employees who are eligible to appeal grievances to the board." We have in the past attempted to keep the Board from interfering with decisions left to the State as the employer, noting that the Board's duty

> is to decide whether there was, in law, just cause for the action taken, not whether it agrees or disagrees with that action. It has power to police the exercise of discretion by the employer and to keep such actions within legal limits. But the Board is not given, by the statute or by the agreement, any authority to substitute its own judgment for that of the employer, exercised within the limits of law or contract.

*In re Gage, supra,* 137 Vt. at 19, 398 A.2d at 299. See also *In re Harrison, supra,* 141 Vt. at 219, 446 A.2d at 367–68; *In re Carlson, supra,* 140 Vt. at 560, 442 A.2d at 60. Here, rather than substituting its judgment for the employer's, the Board has substituted the employer's judgment for its own.

We reiterate: "In grievance proceedings, the Board acts as a quasi-judicial body, determining questions of law *and fact . . . ." In re Brooks, supra,* 135 Vt. at 565, 382 A.2d at 206 (emphasis added). "As a quasi-judicial body . . . the Board is bound to grant the parties a fair and open hearing. In particular, its rulings must comport with the essentials of due process." *Id.* at 569, 382 A.2d at 208 (citations omitted). Due process does not allow the State to deprive this grievant of her job on evidence which rises only to the level of "more than a mere scintilla."

The collective bargaining agreement gives state employees a vested property interest in continued employment, absent just cause for dismissal. See *Burroughs* v. *West Windsor Board of School Directors,* 138 Vt. 575, 578–79, 420 A.2d 861, 863 (1980). The Fourteenth Amendment to the United States Constitution affords procedural due process protections to a property interest. *Id.* at 579, 420 A.2d at 863: *Board of Regents* v. *Roth,* 408 U.S. 564, 569 (1972). Among the essentials of due process is "the right to have the burden of persuasion cast upon those who would terminate the right under consideration." *Burroughs* v. *West Windsor Board of School Directors, supra,* 138 Vt. at 579, 420 A.2d at 864.

Here, that burden was shifted to the party whose right was at stake when the Board automatically credited the evidence of the employer by according it "considerable deference," without regard to the veracity of the particular witness before it. This shift deprived the grievant of due process. See *Faulkner Radio, Inc.* v. *FCC,* 557 F.2d 866, 870–73 (D.C. Cir. 1977) (error resulted when trier of fact automatically credited witness' testimony because of professional class to which he belonged).

The burden of persuasion on factual issues before an administrative body "is met by the usual civil case standard of 'a preponderance of evidence.' " McCormick, Evidence § 355, at 853 (E. Cleary ed. 1972); *In re Lyon,* 3 VLRB 131, 142 (1980). A preponderance of the evidence requires at the very least that one of the scale's pans makes down weight, "though the scales drop but a feather's weight." *Livanovitch* v. *Livanovitch,* 99 Vt. 327, 328, 131 A. 799, 800 (1926). "[I]f the conflicting evidence of the parties is of equal weight, or if the evidence of the [grievant] outweighs that of the

[State], the evidence of the [State] does not preponderate." *White River Chair Co.* v. *Connecticut River Power Co.*, 105 Vt. 24, 39–40, 162 A. 859, 865 (1932). See also *Rogers* v. *W. T. Grant Co.*, *supra*, 132 Vt. at 488, 321 A.2d at 57.

█ By adopting the substantial evidence rule, the Board created the possibility that a grievant might lose her job despite the inability of the State to prove, by a preponderance of the evidence, that her dismissal was for just cause. This result contravenes the Board's statutory duty to determine for itself the factual question of whether just cause existed, denies the grievant due process, and deprives her of the benefit of contract provisions entered into after collective bargaining between the State and its employees.

## B.

█ As a further ground for reversal on the just cause issue, the grievant urges the failure of the State's evidence to show that her performance during the probationary period was in fact unsatisfactory. The Board's only finding covering her performance during this period merely recited the opinion testimony of the supervisor who had evaluated her. The supervisor stated that in her opinion the deficiencies had continued. This approach flows from the Board's erroneous use of an appellate standard to determine an issue of fact, and points up its theory that "in examining the merits of a dismissal for performance reasons, [it should] give considerable deference to the evaluator(s)." Whatever the motivation, "Under the familiar rule of *Krupp* v. *Krupp*, 126 Vt. 511, 236 A.2d 653 (1967), such recitals are not findings." *In re Yashko*, 138 Vt. 364, 365, 415 A.2d 1322, 1323 (1980).

The grievant argues that the issue of continued unsatisfactory performance during the probationary period goes to one of the two criteria of reasonableness—the requirement of reasonable notice that certain conduct will result in loss of employment. *In re Brooks*, *supra*, 135 Vt. at 568, 382 A.2d at 207–08. If she was in reality dismissed for deficiencies which occurred prior to the warning period, then it was not a warning period at all, and notice might well be inadequate. Cf. *In re Yashko*, *supra*, 138 Vt. at 366, 415 A.2d at 1324

(failure to notify grievant that he could only be dismissed for cause deprived him of fair notice).

The requirement of reasonable notice is also implicated by the grievant's complaint that the work at which she was allegedly deficient is not within the Typist B classification. Our disposition of the other issues, however, makes it unnecessary to address issues of reasonable notice. "We would, however, strongly commend the making of specific findings with respect to a raised point which could well be determinative," when the Board takes up this case anew on remand. *Id.* at 367, 415 A.2d at 1324.

## II.

The Board also erred in holding that the progressive discipline provisions of the contract do not apply to a dismissal for inability to perform, but are limited to dismissal for misconduct. "The parties are bound by the common meaning of their words where the language is clear . . . ." *Hackel* v. *Vermont State Colleges,* 140 Vt. 446, 452, 438 A.2d 1119, 1122 (1981). The plain meaning of the words here provides no basis for the Board's distinction between dismissals for misconduct and dismissals for nonperformance.

 Dismissals are covered by Article XV of the collective bargaining agreement. That provision, entitled *Disciplinary Action,* speaks only of "dismissal"; it does not provide for two species. A dismissal, for whatever reason, is a dismissal, and is plainly denominated a form of discipline. Moreover, Article XV specifically states that dismissal is the most severe of the sanctions set out in the progressive discipline section. Finally, it is Article XV which creates the requirement that dismissal be for "just cause," the very issue which was before the Board.[1]

---

[1]

### ARTICLE—XV
### DISCIPLINARY ACTION

1. The parties jointly recognize the deterrent value of disciplinary action. Accordingly, the State will:

(a) act promptly to impose discipline within a reasonable time of the offense;

The Board, however, looked to Article XIII, entitled *Performance Evaluations and Notices of Performance,* and to matters extrinsic to the contract to justify its holding that the State was not required to apply progressive discipline:

> Dismissal based on performance deficiencies, while for cause, is not a disciplinary action contemplated by the contract under the progressive discipline system. Disciplinary actions, we think, are imposed for some act of misconduct, not nonperformance. Grievant's dismissal here was a matter of employee performance evaluation, an area covered in Article XIII² of the contract, and the *Rules and Regulations.*

---

(b) apply discipline with a view toward uniformity and consistency; and

(c) impose a procedure of progressive discipline, in increasing order of severity:

1. oral reprimand;
2. written reprimand;
3. suspension without pay;
4. demotion;
5. dismissal.

The parties agree that there are appropriate cases that may warrant the State bypassing progressive discipline or applying discipline in differing degrees so long as it is imposing discipline for just cause.

. . . .

²

ARTICLE—XIII

PERFORMANCE EVALUATION AND NOTICE OF
PERFORMANCE DEFICIENCY

Annual performance evaluations shall normally take place near the anniversary date of completion of original probation.

The determination of performance evaluation standards and criteria is understood to be the exclusive prerogative of management, provided, however, the State will notify VSEA of any proposed change in the form or of such standards and criteria as they appear on the form and give VSEA an opportunity to negotiate to the extent required by law the changed form prior to its implementation.

Employees shall be notified of their performance evaluation by their supervisors. One copy of the rating form shall be provided to the employee and one copy shall be retained by the agency.

The immediate supervisor shall discuss the rating with the employee, calling attention to particular areas of performance and when

■ As plainly appears, Article XIII has absolutely nothing to do with dismissal. We are also dismayed by the Board's resort to *Rules and Regulations,* which were unilaterally promulgated by the employer, to insert into the provisions of an agreement negotiated by the employer with its employees something which isn't there. To do so is to write a new contract for the parties. When the agreement to be construed is clear and unambiguous, as here, extrinsic evidence is inadmissible for the very reason that "it could alter the understanding of the parties embodied in the language they chose to best express their intent." *Hackel* v. *Vermont State Colleges, supra,* 140 Vt. at 452, 438 A.2d at 1122; *Allen Engineering, Inc.* v. *Summit Realty Corp.,* 137 Vt. 535, 536, 409 A.2d 559 (1979). See also *Nzomo* v. *Vermont State Colleges,* 136 Vt. 97, 102, 385 A.2d 1099, 1102 (1978).

■ The language the parties chose in Article XV clearly and unambiguously states that discipline shall be administered only for just cause, that ordinarily dismissal should be the last step in a series of progressively severe sanctions, but that "[t]he parties agree that there are appropriate cases that may warrant the State bypassing progressive discipline or applying discipline in differing degrees so long as it is imposing discipline for just cause." See *In re Carlson, supra,* 140 Vt. at 558, 442 A.2d at 60 (dismissal appropriate without recourse to progressive discipline where employee has defrauded the State of substantial amounts). Whether the State properly bypassed progressive discipline in the present case is an issue of fact, committed by the legislature to the Board for *its* determination, in light of the law and the contract which the parties actually negotiated. The Board's determination of that issue is to be based on a preponderance of the evidence presented.

*Reversed and remanded for further proceedings consistent with this opinion.*

---

necessary pointing out specific ways in which performance may be improved. During the rating year, immediate supervisors shall call the employees' attention to work deficiencies which may adversely affect a rating.

The employee copy of the rating shall constitute official notice to the employee of his rating.