## Grievance of David Murray and Vermont State Colleges Faculty Federation

[689 A.2d 463]

No. 95-296

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed January 17, 1997

*John L. Pacht* and *Robert W. Katims* of *Hoff, Curtis, Pacht, Cassidy & Frame, P.C.*, Burlington, for Appellants.

*Nicholas DiGiovanni, Jr.*, of *Morgan, Brown & Joy*, Boston, Massachusetts, and *Paul K. Sutherland* of *Sutherland & Collins, Inc.*, Burlington, for Appellee.

**Gibson, J.** David Murray (grievant) and the Vermont State Colleges Faculty Federation appeal from a decision of the Vermont Labor Relations Board denying reappointment of grievant to a third year of service at Castleton State College. The Vermont State Colleges (VSC) cross-appeal from the Board's decision that the College violated the collective bargaining agreement between the Federation and VSC by removing grievant's position from the faculty bargaining unit and making it an administrative position. We affirm.

The College hired grievant in the Fall of 1992 as an assistant professor and as director of student teaching. Grievant's job as director of student teaching included matching a student's practice-teaching placement preference with available placement sites, developing additional sites, reviewing each student's record to determine qualification for teaching licensure in Vermont, and making appropriate recommendations regarding individual students. A recurring issue within the student-teaching program was the amount of guidance grievant was supposed to offer other faculty members directly supervising student teachers working in their placement sites.

Academic Dean Joseph Mark appointed grievant to a second year in 1993, after receiving a favorable report from the College's Retention, Promotion and Tenure (RPT) Committee, but Mark noted in his recommendation that he was "seriously concerned" about the Col-

lege's relationship with cooperating schools and that it was important for the director of student teaching to offer guidance to college faculty and cooperating teachers whose job it was to supervise student teachers. Grievant responded to Mark's comments in a memorandum asking for clarification of his responsibilities with respect to other College faculty and cooperating teachers, suggesting that the amount of guidance needed was minimal and that all he could offer was "collegial support," since the College faculty supervisors "are my peers."

During the Fall of 1993, the College's Education Department chair and associate chair wrote letters supporting promotion of grievant to associate professor, and the RPT Committee recommended his appointment for a third year. In January 1994, the Education Department presented to Mark, who was then Castleton's interim president, a self-study based on a wide survey of persons concerned with the program that criticized the student teaching program for "lack of supervision of student teachers." Grievant responded with a memorandum stating that "the real focus should be on faculty assuming their responsibilities for the supervision of student teachers in their charge and making the appropriate site visits, since this is where the real problems lie."

On February 1, 1994, Associate Dean Joan Mulligan recommended that grievant be reappointed, but expressed reservations. Grievant sent Mark a lengthy rebuttal to Mulligan's letter, stating that her "comments are totally inaccurate and, in fact, reflect a great deal of ignorance on her part in regards [sic] to the role of the Director."

The Board found that interim President Mark "gradually came to believe that the best solution for the Castleton Student Teaching program would be the creation of an administration position outside the faculty bargaining unit." The rationale for this change was better supervision of Education Department faculty than a fellow faculty member could provide, which was in accordance with grievant's comments about the difficulty of his supervising fellow faculty members. Mark met with senior members of the Education Department to discuss whether these changes should be made, expressing concern that the College's ability to place students was being negatively affected and improvement was needed. Mark did not discuss these proposals with grievant.

On March 1, 1994 Mark notified grievant that he would not be reappointed to a third year, but stated no reasons. The Federation filed a grievance, alleging, in essence, that the College had failed to follow Article 21(J)(2) and (4) of the Agreement, which state:

2. The President shall decide whether or not a faculty member shall be reappointed to a second, third, or fourth year of service according to the provisions of Article 20 and this Article. In making this decision, the President shall consider only the performance of the faculty member and the faculty staffing needs at the College.

. . . .

4. A decision of the President not to reappoint a faculty member to a second, third, or fourth year of service shall not be subject to the grievance and arbitration provisions of this Agreement unless the faculty member or the Federation claims the decision violates Article 7 (Academic Freedom), Article 8 (Anti-Discrimination), or the procedure for reappointment set forth in this Agreement.

The Federation maintained that in considering nonreappointment of a faculty member, Article 21(J)(2) mandated consideration of grievant's performance and that omission of such consideration was a violation of the Agreement. In a second appeal, the Federation also asked that Dean Mulligan's letter be deleted from grievant's file. In a third appeal, the Federation argued that the unilateral decision by the College to convert grievant's position from a faculty to an administrative position violated the faculty-governance provisions of the contract.

The Board denied the reinstatement grievance, first defining the scope of "procedure of appointment":

[T]his claim of the Federation reads too much into the meaning of "procedure of appointment," which we conclude is limited to ensuring that there is adherence to the mechanics of the reappointment procedure such as entering materials in the faculty member's personnel file, meeting deadlines for evaluations, recommendations, and decisions; and meeting notice requirements.

The Board found that Mark did not base his decision on grievant's performance, but instead decided "as a matter of addressing the staffing needs of the College that the duties of Director of Student Teaching should not be handled by a faculty member."

The Board also found that Mark's decision not to reappoint grievant was not based on Mulligan's recommendation, but it did order the Mulligan letter stricken from grievant's employment file. It

also granted the Federation's grievance with respect to creation of the administrative position, ordering that the VSC provide the faculty assembly at the College with the opportunity to consider the proposed removal from the bargaining unit of duties that were previously performed by a faculty member. The appeals of grievant, the Federation, and VSC followed.

## I.

■ In reviewing the Board's conclusion, this Court may "'only ask whether the findings of fact taken as a whole justify the Board's ultimate conclusion.'" *Vermont State Colleges Faculty Fed'n v. Vermont State Colleges*, 152 Vt. 343, 348, 566 A.2d 955, 958 (1989) (quoting *In re Liquor Control Dep't Non-supervisory Employees*, 135 Vt. 623, 625, 383 A.2d 612, 613 (1978)). If there is factual support for the Board's conclusion, we will leave it undisturbed.

Grievant argues first that the Board erred in ruling that interim College President Mark did not violate the Agreement in denying his reappointment, specifically that the Board erred in failing to allow a limited substantive review of grievant's performance as well as the faculty staffing needs at the college. Grievant argues that in precluding substantive review of the process under Article 21(J)(2), the Board effectively rendered that provision meaningless.

■■ Traditional principles of contract law govern the construction of collective bargaining agreements. See, e.g., *In re Muzzy*, 141 Vt. 463, 474-76, 449 A.2d 970, 975-76 (1982); *Hackel v. Vermont State Colleges*, 140 Vt. 446, 452, 438 A.2d 1119, 1122 (1981). In this matter, grievant fails to read subsections (2) and (4) of Article 21(J) as consistent and harmonious parts of the same whole. See *In re VSEA*, 139 Vt. 63, 65, 421 A.2d 1311, 1312 (1980). Agreements, like statutes, can benefit from provisions that are directory, not mandatory. See *In re Mullestein*, 148 Vt. 170, 174, 531 A.2d 890, 892 (1987) (sixty-day statutory time period construed as directory, not mandatory). The Agreement is rendered neither ambiguous nor inconsistent by setting forth guidelines for reappointment of faculty members in general, while prescribing that the grievance and arbitration procedures with respect to the guidelines should apply only to faculty members serving more than four years.

In contrast to the limited review of retention decisions with respect to the first four years of employment, Article 21(K)(4) does require that the College state reasons for nonreappointment thereafter:

4. Should the President decide not to reappoint a faculty member to fifth and sixth years of service, the written notification of non-reappointment . . . shall contain reasons for the non-reappointment.

Employees seeking a fifth year of service can grieve nonrenewal on grounds that the nonrenewal decision was "unreasonable or arbitrary or based on erroneous reasons or material." Article 21(K)(5). Including the requirement of reasons in Article 21(K)(4) underscores the absence of that requirement in Article 21(J)(4).

These distinctions would make no sense if any faculty member, once employed, could grieve any nonrenewal decision. As we stated in *Swett v. Vermont State Colleges*, 141 Vt. 275, 277, 448 A.2d 150, 151 (1982), where the issue was nonreappointment to a second year of teaching and where we held with respect to similar terms in a predecessor agreement:

Under the plain language of the agreement the presumption of renewal for faculty with less than three years is terminated upon proper written notification and nothing more. As long as notice is properly given the college has total discretion in such renewal decisions. To hold otherwise is to ignore the distinction made in the contract. . . .

Grievant further argues that the college violated article XXII of the collective bargaining agreement and its own rules by failing to accord teaching effectiveness any appreciable weight in its decision. We disagree. While the rules state that teaching is the most important activity in the evaluation process, article XXII requires only that teacher evaluations be used to "aid" in the reappointment decision. It does not require that the decision be based in whole or in part on the evaluations.

Grievant argues that as a result of our decision in *Swett*, the reappointment article of the agreement was substantially changed. The version of the agreement in effect at the time of the *Swett* decision contained a reappointment clause stating that "[i]n all cases of non-reappointment written notice of reasons shall be given after the third full year of service." *Id.* Grievant does not explain how Article 21(J)(2) and (4) are inconsistent with the earlier text. If at all different, Article 21(J)(4) plainly rules out a grievance of a decision not to reappoint a faculty member to a second, third, or fourth year of service.

In sum, the Board's instruction is consistent with the Agreement as a whole, which reflects limited grievance rights for faculty in the first four years of employment and more expansive rights thereafter. Again, this reading does not render Article 21(J)(2) meaningless. It can serve a positive purpose in reminding the president of his or her guiding standards in considering faculty serving less than four years — even if the decision itself may not be substantively reviewed.

## II.

VSC cross-appeals the Board's ruling that it violated Article 19(C)(6) by reorganizing the academic student teaching program, thereby changing grievant's faculty position to an administrative position, without allowing the faculty assembly an opportunity to consider the matter. Article 19(C)(6) states in relevant part:

> C. Recognizing the final determining authority of the President, matters of academic concern shall be initiated by the Faculty Assembly or by the President through the Faculty Assembly which shall consider the matter and respond within a reasonable time. Such matters shall include:
>
> . . . .
>
> 6. The development, curtailment or reorganization of academic programs.

In concluding that the College had violated Article 19(C)(6), the Board stressed that it had shifted responsibilities long held by an Education Department faculty member to an administrator reporting directly to the academic dean, thereby removing these responsibilities from the faculty bargaining unit. The Board noted that while the administrator would have some new duties, the bulk of the duties remained the same.

VSC argues that "reorganization" implies a more substantial kind of change — a focus on the "substantive aspects of the academic program *from an educational perspective* rather than administrative structure," giving as examples of reorganization the development of a new educational program, cutting back on or eliminating an existing major, and naming given courses as program prerequisites.

■ The Board's findings and conclusions on this question were well within its discretion. Article 19(C)(6) recites a touchstone principle in the phrase "matters of academic concern," and the removal of

a faculty member from the stewardship of a major college program fits well within that description. Moreover, VSC has not demonstrated that the distinction is meaningful in the present context. It implies that grievant dealt principally with administrative concerns, but, as the Federation points out, before the change, he dealt with the program as a faculty person with academic as well as administrative concerns. It is not difficult to understand that amending the job description of the head of a program can alter the tenor of the program itself. In sum, VSC's distinction focuses too much on the perceived degree of reorganization and looks too little at the functional result of making changes in leadership and direction at the top.

Finally, VSC appeals the Board's grant of the Federation's unit clarification petition. The Board did not declare whether the bargaining unit included any particular position, but rather, directed that VSC provide the faculty assembly "the opportunity to consider the Colleges' proposed removal from the faculty bargaining unit of duties performed by the faculty member serving as Director of Student Teaching" — essentially the same relief granted in the appeal under Article 19(C)(6). There was no error in this narrow direction to the College.

*Affirmed.*