NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 82

No. 2021-117

In re Grievance of Patrick Ryan

Supreme Court

On Appeal from
Labor Relations Board

September Term, 2021


Robert Greemore, Acting Chair

Thomas J. Donovan, Jr., Attorney General, and Alison L.T. Powers, Assistant Attorney General, Montpelier, for Appellant/Cross-Appellee.

Pietro J. Lynn of Lynn, Lynn, Blackman & Manitsky, P.C., Burlington, for Appellee/ Cross-Appellant.


PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1.    **PER CURIAM.**   The State of Vermont appeals a decision of the Vermont Labor Relations Board concluding that the State as employer lacked just cause to terminate grievant Patrick Ryan on account of actions he took as a member of the State workforce, and reducing grievant's discipline to a fifteen-day suspension.  Grievant cross-appeals, contending that the Board erred in imposing the fifteen-day suspension.  We conclude that the Board's findings are inadequate to enable informed appellate review.  For that reason, we reverse and remand to the Board for further factfinding.

## I. The Board's Decision

¶ 2.    After a two-day hearing, the Board made the following findings.[1]  Grievant began working at the Department for Children and Families (DCF) in 2004 as a social worker; he was promoted to Social Services Supervisor in 2012.  While he was a supervisor, grievant served with Employee A on a committee of community entities working together to provide funding for families in need.  At the time, Employee A worked for a social services agency that sometimes worked with DCF.  Grievant and Employee A had professional communications via text messaging, email, and telephone, and their workplaces were next door to one another.  They did not have a social relationship outside of work.  During the summer of 2013, grievant and Employee A exchanged some text messages that were not work related and were flirtatious.  Using his state-issued cell phone during work hours, grievant would compliment her on some aspect of her appearance or clothing, sometimes while watching her through the window.  Employee A could not describe or recall the specific details of the text messages she received from grievant but viewed the texts as "awkward" because she was married.

¶ 3.    In March 2015, grievant was promoted to District Director of the Family Services Division ("FSD") at the Newport office.  In that capacity, he participated in hiring decisions, evaluated staff performance, and was responsible for various personnel matters.  In August 2015, DCF hired Employee A as a social worker.  As District Director, grievant participated in Employee A's interview, and made the final hiring decision.  During the hiring process, grievant did not disclose to his supervisors his prior nonwork-related communications with Employee A.

¶ 4.    Upon employment, Employee A was in grievant's chain of command; she reported directly to a supervisor who reported directly to grievant.  After she was hired, the flirtatious messages continued between grievant and Employee A.  Employee A said to grievant during

---

[1]  We have accepted the Board's characterization of the following as findings.  As set forth more fully in our analysis, we conclude that many of these findings relating to the salient issues in this appeal are mere recitations of the evidence that do not themselves advance the analysis.

casual conversations words to the effect of "I'm not sure this [texting] should be happening anymore." Several months into the job, Employee A initiated a conversation with grievant in which she told him that she was more sexually aroused during pregnancy and that her breasts were getting larger and were sore. Grievant asked whether her breasts hurt when they were touched, and she responded that they did not.

¶ 5. Shortly thereafter, just before she went on maternity leave, Employee A told grievant that a coworker had asked her if she was sleeping with grievant. Employee A told Grievant that the text messages had to stop because she wanted her work to be judged based on her abilities, and not her relationship with grievant. From that point onward, all flirtatious communications between the pair ceased. There is no evidence that grievant retaliated against Employee A due to her request.

¶ 6. The Board's findings recount in detail the content of grievant's performance evaluations in the spring of 2016, 2017, 2018, and 2019. The ratings were all "satisfactory." The accompanying narratives reflect ongoing concerns that office morale was suffering under grievant's leadership, and acknowledge his efforts to address the perceptions that he did not foster a safe and supportive workplace environment.

¶ 7. The Board found that in the fall of 2019, DCF initiated an investigation into why so few employees from the FSD Newport office had participated in an office culture and climate survey. During the investigation, several staff members expressed various concerns about grievant. As a consequence, Department of Human Resources (DHR) investigator Peter Canales was assigned to conduct an investigation of grievant. The investigator's report documented his interview with Employee A. Per the investigator's report, Employee A described grievant's text messages as at "the low end of lewd and lascivious," including comments about her appearance and descriptions of things "of a sexualized nature" that he wanted to do to her. She cited as an example of the type of message he would send: "What if I had kissed you?" Although Employee A acknowledged that there were times when "possibly" she participated, there were multiple

3

occasions when she told grievant, "We can't be doing this." She reported that she told him a dozen times during the first two years she worked at DCF to stop sending her sexualized text messages and emphasized that he was the director and she was the "low man on the totem pole," but he continued sending the messages. Employee A did not save any of the messages.

¶ 8. The Board quoted extensively from the investigator's report, which also described the investigator's exchange with grievant concerning grievant's communications with Employee A. Grievant described the relationship he had with Employee A as "jokey," and reported that when Employee A came to work at DCF they had a couple of conversations about making sure that they not joke like that anymore. Grievant acknowledged that the communications between him and Employee A had been "flirty," but indicated that they had stopped, probably within her first year at DCF, after she brought up to him that she wanted it to stop. Grievant did not recall whether some of the messages could be characterized as "sexualized," and when asked whether they were "appropriate," he said he didn't know what that meant.[2]

¶ 9. As a result of the investigation into his conduct, in January 2020 DCF sent Grievant a Loudermill letter, notifying him that DCF was contemplating "serious disciplinary action, up to and including dismissal."[3] The letter recounted Employee A's report that his "kind of lewd" sexualized texts to her from his work-issued cell phone continued after he hired her to work at DCF, that he did not stop the texts even after she asked him to, and that she was definitely targeted

---

[2] The Board described Employee A's and grievant's conflicting documented statements to the investigator; it did not attempt to reconcile those statements with each other or with the hearing testimony, and did not explain whether and how these statements informed the Board's understanding of the underlying facts.

[3] In Cleveland Board of Education v. Loudermill, the U.S. Supreme Court held that oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to present their own side of the story before terminating a tenured government employees satisfied due process where the terminated employee was then entitled to a full administrative hearing and judicial review post termination. See Hallsmith v. City of Montpelier, 2015 VT 83, ¶¶ 13-14, 199 Vt. 488, 125 A.3d 882 (citing Loudermill, 470 U.S. 532, 546 (1985)). A Loudermill notice or letter is a writing through which the government employer provides the notice and explanation; a Loudermill meeting is a meeting in which the employee has an opportunity to respond before the government employer terminates the employee.

4

for having asked him to stop. It included reports from various Newport FSD staff that grievant was "intimidating," "bullying," and sometimes communicated with staff in a demeaning or belittling way. And it parsed in some detail the arguable inconsistencies among some of grievant's responses to the investigator during the investigative interview. The letter concluded that grievant's ongoing intimidating conduct toward staff violated State of Vermont Personnel Policy 11.11 (Workplace Safety and Security); that his sending sexualized texts to a subordinate staff member on his work-issued cell phone even after a number of pleas to stop violated Personnel Policy 3.1 (Sexual Harassment) and 5.6 (Employee Conduct); and that his answers in the investigative interview "may not have been entirely truthful" in violation of Personnel Policy 17.0 (Employment Related Investigations).

¶ 10.    The Board found that in the ensuing Loudermill meeting, grievant described their text exchanges before Employee A came to work at DCF as welcome. He indicated that Employee A initiated the text message exchange about how being pregnant caused her to be more aroused and gave her sore breasts. And he indicated that as soon as she told him that they needed to stop the flirtatious behavior he did not send any more flirtatious text messages. Grievant acknowledged that the messages were inappropriate, especially after Employee A came to work at DCF, and apologized for his lapse in judgment.

¶ 11.    DCF Deputy Commissioner Johnson subsequently dismissed grievant. In the termination letter, the Deputy Commissioner cited grievant's inappropriate sexualized text messages to a subordinate, using a state-issued cell phone, as well as his hostile, intimidating, bullying, and demeaning interactions with staff. The Deputy Commissioner emphasized that the sexualized text messages were the most significant misconduct driving the dismissal decision, and indicated that grievant's actions had destroyed the confidence of DCF management in his ability to continue effectively in the Director position.

¶ 12.    Based on the above, the Board concluded that the State lacked just cause to dismiss grievant. With respect to the allegations relating to grievant's communications with Employee A,

5

the Board stated that the State's charge was hampered by the fact that none of the alleged inappropriate sexualized messages were admitted into evidence, and neither Employee A nor grievant recalled the specific content of the messages they had exchanged, with the exception of the exchange involving grievant asking a pregnant Employee A if her breasts hurt to be touched after she initiated a conversation in which she reported that she was more sexually aroused during her pregnancy and that her breasts were getting larger and were sore. The text messages were characterized generally as "flirtatious," but the Board concluded that the seriousness of grievant's misconduct was somewhat tempered by the fact that the State had not established that the text messages were unwelcome to Employee A.[4] The Board indicated that once Employee A indicated that they were unwelcome, grievant sent no further text messages.

¶ 13.    The Board considered the State of Vermont's Personnel Policies and Procedures 3.1 concerning sexual harassment, which provides, in part, as follows:

**DEFINITION OF SEXUAL HARASSMENT**

The prohibition of sexual harassment is found in the Vermont Statutes at Title 21 § 495h. Sexual harassment is a form of discrimination based on sex (and/or gender identity), and is defined in Title 21 § 495d(13). Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when:

a) submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
b) submission to or rejection of such conduct by an individual is used as a component of the basis for employment decisions affecting that individual; or
c) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or of creating an intimidating, hostile, or offensive work environment.

Sexual harassment can be verbal, physical, auditory, and/or visual. It can be either subtle or overt. Sexual harassment refers to behavior that is not only unwelcome, but can also be personally offensive, fails to respect the rights of others, lowers morale and interferes with work effectiveness, or violates a person's sense of well-being.

---

[4] Significantly, the Board did not find that the text messages were welcome; it simply found that the State had not established that they were not.

6

¶ 14.    Applying this definition, the Board first considered caselaw relating to "hostile environment" sexual harassment under Title VII, which the Board described as harassment involving " 'discriminatory intimidation, ridicule, and insult' that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " The Board concluded that the State had not established "actionable sexual harassment" of this type, both because of the lack of specificity concerning the text messages and because the State had not established that the messages were unwelcome.

¶ 15.    However, the Board explained that "[a]nother category of sexual harassment under the policy is behavior that is 'personally offensive, fails to respect the rights of others, lowers morale and interferes with work effectiveness, and violates a person's sense of well-being.' " The Board concluded that grievant's conduct fell within this category. It concluded that as a supervisor, it was inappropriate for grievant to engage in flirtatious messages with a subordinate employee in his chain of command; that a perception of favoritism very well may result from such a relationship; that the subordinate employee may not be evaluated on the merits of her work performance; and that the inherent power a supervisor has over a subordinate employee looms over such interactions. The Board noted that grievant's behavior would tend to lower morale, and could interfere with work effectiveness, and emphasized that his inquiry about whether Employee A's breasts hurt when touched was clearly beyond the bounds of appropriate supervisor-subordinate dialogue and was offensive. The Board concluded that grievant's misconduct also violated Policy 5.6, relating to employee conduct, because he used his State-issued cell phone for inappropriate private use and conducted himself in a manner that brought discredit or embarrassment to the State.

¶ 16.    With respect to the claim that grievant violated Policy 17.0, the Board determined DCF was unable to establish by a preponderance of the evidence that grievant violated State policy through evasiveness while answering investigatory questions. The Board attributed the generality and vagueness of some of grievant's answers in the investigative interview to difficulty

7

recollecting distant communications that he did not know he would be questioned about, rather than dishonesty.

¶ 17.   Finally, the Board stated that the charge that grievant engaged in intimidating, bullying and demeaning behaviors in interacting with staff should have been addressed through the performance evaluation process, not treated as misconduct.  Accordingly, the Board declined to consider this charge in evaluating the propriety of the State's dismissal of grievant.

¶ 18.   Considering the charges, the State did establish against grievant, the Board applied the standards set forth in <u>Colleran</u> determining whether the State exercised its discretion within tolerable limits of reasonableness.  See <u>In re Colleran</u>, 6 V.L.R.B. 235, 268-69 (1983).  The Board concluded that grievant's actions were serious but reiterated that they were not as serious as alleged because the lack of specificity concerning the messages blunted the level of proven misconduct and the State did not establish that the communications were unwelcome.  The Board concluded that grievant had fair notice that the inappropriate text messages with Employee A could result in his dismissal, and that his misconduct had an adverse effect on his ability to perform at a satisfactory level and on supervisors' confidence in his ability to perform assigned duties. However, the Board concluded that the adverse effect was mitigated somewhat by the fact that the misconduct occurred several years earlier and had stopped once it was clear the messages were unwelcome.  The Board concluded that grievant's past work and disciplinary record weighed in his favor.  Considering these factors, the Board concluded that the State did not have just cause to dismiss grievant, and that a fifteen-day suspension would be an adequate and effective sanction. The State and grievant both appealed the Board's decision.

## II.  Analysis on Appeal

¶ 19.   The State does not directly challenge the Board's factual findings, but argues that the Board's conclusions are not supported by its findings.  In particular, it argues that the Board did not adequately analyze whether the text messages were unwelcome by Employee A; applied the incorrect legal analysis by considering sexual harassment cases decided under Title VII of the

8

Civil Rights Act of 1964 rather than focusing on the Personnel Policy; failed to give adequate weight to the inherent power a supervisor has over a subordinate employee in assessing the severity of the conduct; and substituted its judgment for the State's as employer. Ultimately, the State argues that it established just cause for dismissal, and the Board erred in concluding otherwise. In his cross-appeal, grievant asks this Court overturn the fifteen-day suspension imposed by the Board, arguing that the findings do not support it.

¶ 20. Our review is shaped by the two layers of review involved when this Court reviews the Board's review of the State's dismissal decision. In re Jewett, 2009 VT 67, ¶¶ 21-25, 186 Vt. 160, 978 A.2d 470. With respect to the Board's findings and conclusions, our review is generally deferential; we will not disturb the Board's findings of fact unless they are clearly erroneous, and we will treat the Board's conclusions with deference if they are supported by the findings. Id. 25.

¶ 21. But our review with respect to the ultimate "just cause" determination is not deferential, as this Court is responsible for ensuring that the Board does not overstep its authority by substituting its own judgment for that of the State. Id. As we explained in Jewett, in a grievance proceeding, the Board's role "is limited to determining whether the State met its burden of demonstrating by a preponderance of the evidence that there was just cause for dismissal." Id. ¶ 23. If the State establishes that management "responsibly balanced the relevant factors in a particular case and struck a balance within tolerable limits of reasonableness, its penalty decision will be upheld." Id. ¶ 24 (citation omitted). Because directing the work force is "an inherent management function," as long as the State exercises its management prerogatives reasonably its determination will be sustained." Id. (citation omitted). In determining whether the State's dismissal decision fell "within the tolerable limits of reasonableness," we do not defer to the Board's assessment.

¶ 22. Neither party challenges the Board's findings; both argue that the Board's conclusions are not supported by its findings. We cannot readily evaluate the connection between the Board's findings and its conclusions for at least two reasons. First, many of the Board's factual

9

findings were simply recitations of evidence. Second, the Board offered little analysis of the evidence so we cannot discern how the Board assessed the weight and credibility of the evidence and reached its factual findings and conclusions of law. We elaborate on these concerns below.

¶ 23. For at least the past forty-five years we have recognized that the mere recitation of evidence is "immaterial and . . . not for consideration." Krupp v. Krupp, 126 Vt. 511, 515, 236 A.2d 653, 656 (1967) (stating recitations of evidence are not findings of fact and cannot be considered so); In re Muzzy, 141 Vt. 463, 471, 449 A.2d 970, 973 (1982) (explaining Board is supposed to "be the detached and impartial finder of fact" rather than appellate body reviewing findings of fact). We have long disfavored Krupp findings and have emphasized "that when the court is sitting as a finder of fact, it should determine the facts rather than merely recite the testimony offered by the parties." In re M.E., 2019 VT 90, ¶ 20 n.3, 211 Vt. 320, 225 A.3d 633.

¶ 24. Although the Board's decision is lengthy, there are very few true factual findings to support it. Much of what the Board relies on is merely a recitation of the testimony and statements made to the DHR investigator. This is insufficient. Roughly seventeen of the approximately twenty-five pages of findings reproduce portions of interviews and letters from the investigation and from employee evaluations. These are all Krupp findings that do not advance our analysis. Three-and-a-half pages collect relevant provisions from the State of Vermont Personnel Policies and procedures as well as a collective-bargaining-agreement provision. These policies may guide the legal analysis, but tell us nothing about the operative facts in this case. Most of the remaining pages consist of the Board's summaries of the conclusions of others, including grievant's employee evaluations and the employer's basis for dismissing him. When the Krupp findings are stripped away, we are unable to determine the Board's actual findings, and thus the basis for its decision.

¶ 25. In addition, the Board provides no insight by way of factual findings into what evidence it found to be credible to support its conclusions. For example, the Board seemed to find that grievant stopped texting Employee A once she asked him to stop, but then described

10

Employee A's statements to the investigator that she asked grievant to stop texting her repeatedly over a significant period of time before he finally did, as well as grievant's statements to the contrary. To the extent that the Board did make a factual finding on this point, it does not explain the analysis or credibility determination that underlies its finding in the face of conflicting evidence. The Board has jurisdiction to "hear and make . . . final determination[s] on the grievances of all employees who are eligible to appeal grievances to the board." 3 V.S.A. § 926(a). In doing so, it "acts as a quasi-judicial body, determining questions of law and fact." In re Brooks, 135 Vt. 563, 565, 382 A.2d 204, 206 (1977). It is the factfinder's obligation to weigh the credibility of evidence. In re N.H., 168 Vt. 508, 512, 724 A.2d 467, 470 ("We rely on the factfinder's assessment of the credibility of the witnesses and weighing of the evidence."). Without insight into the Board's credibility determinations, we cannot meaningfully review the Board's decision on the record provided. See Richard v. Richard, 146 Vt. 286, 287, 501 A.2d 1190, 1190-91 (1985) ("The purpose of findings is to provide a clear statement as to what was decided and why; where no indication appears of the method employed and weight accorded various factors, remand is necessary.").

¶ 26. In Muzzy, we declined to allow the Board to use "fallacious legal principles to avoid its duty to find the facts." 141 Vt. at 468, 449 A.2d at 972. Likewise, we decline to allow the Board to "avoid its duty to find the facts" by merely reciting evidence, no matter how extensive that recitation may be. Id. The proper remedy where findings are absent is to remand for factfinding to take place. See Amiot v. Ames, 166 Vt. 288, 294, 693 A.2d 675, 678 (1997) (stating proper recourse for insufficient findings of fact for Court to determine questions of law is to remand for findings of fact to be made); see also In re Berlin Health & Rehab., Inc., 2006 VT 109, ¶ 14, 180 Vt. 432, 912 A.2d 449 (remanding case to Division of Rate Setting that involved mixed question of fact and law when Court could not discern facts based on record available); In re Muzzy, 141 Vt. at 476, 449 A.2d at 976 (remanding case to Board for further factfinding when Board failed to use proper evidentiary standard). This remedy is particularly appropriate when a

11

decision relies on <u>Krupp</u> findings because the Court "cannot review fact-based conclusions without the necessary underlying findings of fact."  See <u>In re Rumsey</u>, 2012 VT 74, ¶¶ 11-14, 192 Vt. 290, 59 A.3d 730 (remanding to Human Services Board for proper findings when decision relied on <u>Krupp</u> findings).

¶ 27.    For these reasons, we remand to the Board for it to make proper findings and any additional conclusions as may be necessary to support its decision, and to enable this Court to conduct our review with an adequate record of what the Board decided and why.[5]

<u>Reversed and remanded for further proceedings consistent with this opinion</u>.

BY THE COURT:

Paul L. Reiber, Chief Justice

Beth Robinson, Associate Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

William D. Cohen, Associate Justice

---

[5]  On October 1, 2021 this Court entered a partial stay of "any requirement that the State restore grievant to the responsibilities of his position in the workplace pending resolution of this appeal."  Because this appeal does not resolve the merits of the underlying claim, the partial stay is extended until a final determination on the merits about the lawfulness of the dismissal.