### In re Southview Associates

[569 A.2d 501]

No. 87-313

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed December 1, 1989

*Weber, Perra & Wilson*, Brattleboro, for Appellant.

*Jeffrey L. Amestoy*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Appellee.

**Morse, J.** Southview Associates appeals from a ruling of the Environmental Board denying its application for a permit to build a residential development in Stratton and Jamaica, Vermont. The Board based its decision on the finding that the proposed project failed to meet the requirements of Act 250 criterion 8 pertaining to "necessary wildlife habitat." 10 V.S.A. § 6086(a)(8)(A). We affirm.

Southview proposed to build a 33-lot subdivision for vacation homes on 88 acres of land, situated in a "deeryard" comprising some 280–320 acres. The Board found that, although Stratton once contained 600 acres of deeryard, the 280–320 acre area is the only "active deeryard" in a 10.7-square- mile region. It supports approximately 20 deer over the winter. The deeryard con-

tains two significant areas of mature softwood cover, which is critical deer wintering habitat. One of these areas covers approximately half of the Southview property. The Board found that the softwood stand on the Southview property is necessary to the deer population. The development, it found, would destroy ten acres of this critical habitat, with likely secondary effects in a larger area.

Southview submitted a Wildlife Management Plan to mitigate the loss of the ten acres by increasing available deer food and encouraging the growth of immature softwood to replace the cover lost to the development. The Board found, however, that increased food supply would only partially mitigate the adverse effect of the development on the deer, as availability of browse is less important to the deer's survival than good softwood cover, which provides shelter from winter elements and reduces heat loss by radiation. Also, it is critical to the deer population's survival during winter that the deer do not exhaust their fat reserves. Increased physical activity due to the presence of humans, pets, and vehicles would consume these reserves more rapidly.

The Board concluded:

> As a result of the development, it is likely that there will be a loss of deer in this habitat. It is likely that the deer will abandon the remaining cover altogether and those that remain will be less likely to survive due to the high potential of stress created by wintertime noise and activity from people, vehicles, and pets.

The Board concluded further "that the environmental and recreational loss to the public from the destruction and imperilment of the habitat is not outweighed by the economic, social, cultural, recreational or other benefit to the public from the project." Nor did Southview, in the Board's opinion, employ "all feasible and reasonable means of preventing or lessening the destruction and imperilment of the deer habitat." Finally, the Board could not exclude "the possibility of less intensive development in other areas of the site." The Act 250 permit was accordingly denied.

Southview challenges the Board's construction of the relevant statute and argues that the record does not support several of the Board's findings and conclusions.

## I.

Under 10 V.S.A. § 6086(a)(8), a permit will be granted only if the subdivision or development "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." The subsection further provides:

(A) Necessary wildlife habitat and endangered species. A permit will not be granted if it is demonstrated by any party opposing the applicant that a development or subdivision will destroy or significantly imperil necessary wildlife habitat or any endangered species, and

(i) the economic, social, cultural, recreational, or other benefit to the public from the development or subdivision will not outweigh the economic, environmental, or recreational loss to the public from the destruction or imperilment of the habitat or species, or

(ii) all feasible and reasonable means of preventing or lessening the destruction, diminution, or imperilment of the habitat or species have not been or will not continue to be applied, or

(iii) a reasonably acceptable alternative site is owned or controlled by the applicant which would allow the development or subdivision to fulfill its intended purpose.

The permit's opponents—here, the Agency of Natural Resources and the Vermont Natural Resources Council—thus have a dual burden: first, to show that the project "will destroy or significantly imperil necessary wildlife habitat or any endangered species" (only the former is involved in this case); and second, to prove one of the three statements prefaced by small roman numerals.

Southview's first claim on appeal pertains to the meaning of "necessary wildlife habitat." That term is defined at 10 V.S.A. § 6001(12) as a "concentrated habitat which is identifiable and is demonstrated as being decisive to the survival of a species of

wildlife at any period in its life including breeding and migratory periods." Southview contends that the term refers to a habitat that is decisive to the survival of an entire species, rather than to the population of the species that resides in the habitat.

■ In reviewing a statute, we must construe its language so as to give effect to the legislative intent. We will avoid a construction that would render the legislation ineffective or irrational. *State v. Rice*, 145 Vt. 25, 34, 483 A.2d 248, 253 (1984); *In re A.C.*, 144 Vt. 37, 42, 470 A.2d 1191, 1194 (1984).

■■ With this rule of construction in mind, we turn to the question stated succinctly by the Board as follows:

> The threshold issue that must be decided is whether the language "necessary wildlife habitat" in 10 V.S.A. § 6086(a) and defined in § 6001(12), as it applies to the white-tailed deer in Vermont, means habitat that is decisive to the survival of the entire population of deer in Vermont or decisive to the survival of the deer that are dependent upon the habitat.

If the former definition controlled, only the last landowner in the state to develop a deeryard would be subject to the provisions of criterion 8. All other developers would escape a criterion 8 challenge because, no matter how devastating to particular habitats, their projects would not decimate the entire deer herd in Vermont so long as one deeryard remained. This interpretation would render the statute largely ineffective to accomplish its purpose of regulating development throughout the state with an eye to the preservation of the natural environment. See 1969, No. 250 (Adj. Sess.), § 1. As the Board noted, "[t]he statute would be rendered meaningless if it were interpreted to mean that only the last deeryard in the state would be subject to review . . . so that the state deer herd would have to be on the verge of extinction before Criterion 8(A) would apply."[1] The Board must be afforded deference in its interpreta-

---

[1] The statute would be rendered even more irrational and contrary to its purpose if it were interpreted, as Southview appears to urge in parts of its brief,

tion of its own enabling legislation. *In re Eastland, Inc.*, 151 Vt. 497, 499, 562 A.2d 1043, 1044 (1989). We affirm the Board's conclusion that a "necessary wildlife habitat" under Act 250 is one that is decisive to the survival of the population of a particular species that depends upon the habitat.[2] The definition in § 6001(12) uses the words "a species" only to make clear that for habitat to be "necessary" under criterion 8 it need not be decisive to the survival of *all* species of wildlife that flourish there.

Southview vigorously argues that this construction of the statute produces its own absurdity: "For under the Board's definition, no matter how numerous and robust the deer herd in Vermont may be or become, and no matter how many acres of deeryard there may be in the State, if evidence indicates that a deeryard supports a few deer, and that part of it will be destroyed or significantly imperiled by development, that part is necessary wildlife habitat and may not be disturbed." Brief of Appellant, at 10. Southview's concern is overstated. First, the habitat must be "concentrated" and "identifiable." If it is not of a certain quality, it will not be deemed "necessary" under the Act. Second, Southview ignores subparagraphs (i), (ii) and (iii) of criterion 8. The development's opponent must show not only that the development will destroy or imperil necessary wildlife habitat, but must also show that the benefits of the development to the public will not outweigh the loss, or that reasonable means of mitigating the loss have not been attempted, or that the developer owns or controls a reasonably acceptable alternative site for the project. In other words, contrary to Southview's dire predictions, the statute will not foreclose all useful and beneficial development projects whose negative impact on the natural environment is slight.

_____

to mean that a habitat is "necessary" only if it is decisive to the survival of the species—not just in Vermont—but generally over the planet. Then, of course, *no* deeryard in the state could qualify as "necessary wildlife habitat."

[2] Accordingly, the Board correctly refused to make findings, as requested by Southview, on issues such as the total deer population and the total acreage of deeryard in Vermont.

## II.

Southview next argues that there is inadequate support in the record for the Board's findings and conclusions that the property contains habitat that is decisive to the survival of the deer that use it. In support of this argument, Southview points to testimony by witnesses for both sides of the dispute expressing reservations about the severity of destruction to the deeryard that Southview's proposed development would cause. These doubts and reservations do not, however, undermine the Board's initial determination that the Southview property contains necessary wildlife habitat.[3] There was ample evidence on that question, pertaining to the critical need of the deer population for softwood cover during the winter. One of the State's experts testified as follows:

> There is no question that all of Southview's property is a deeryard. . . . Without this deeryard there would be a net loss of deer in the area. This yard provides a haven for the deer that use it. It provides them with shelter that enables them to preserve the energy reserves necessary to get through the winter.

> [The proposed development] will significantly imperil the deeryard which is, of course, a necessary wildlife habitat for the approximately 20–50 deer that use it.

Several other witnesses also testified that the Southview property was decisive to the survival of the deer population.

We will not disturb the Board's findings of fact if there is substantial evidence in the record to support them. 10 V.S.A.

---

[3] Southview appears to argue that because the evidence did not prove that all the deer would perish if the project were completed, the project's opponents failed to prove that the deeryard was "necessary wildlife habitat." This argument again misconstrues the terms of the statute. A concentrated, identifiable deeryard is "necessary wildlife habitat" if it is decisive to the survival of the white-tailed deer that use it during the winter—that is, if the deer require that sort of habitat to survive the winter. Of course, many of the individual animals might survive in another deeryard elsewhere in the state if the project were built; that fact does not render the area to be developed unnecessary to their survival in the sense contemplated by the Act. The contrary interpretation would lead to the absurd conclusion that no single deeryard in the state would qualify as necessary wildlife habitat.

§ 6089(c); see *In re Spear Street Assoc.*, 145 Vt. 496, 499, 494 A.2d 138, 140 (1985). The Board held a de novo hearing in this matter. It took testimony from numerous witnesses, assessed their credentials, weighed their opinions, and, based upon all the evidence before it, found the facts that support its judgment. We are an appellate court, not a fact-finding agency; we must defer to the Board when its findings are supported—even if the record contains contradictory evidence—and when its conclusions are rationally derived from its findings and based on a correct interpretation of the law. That is the case here.

## III.

The third claim on appeal challenges the Board's conclusions pertaining to the three considerations labeled by small roman numerals under criterion 8. The Board ruled in the opponents' favor on all three considerations. We reach only the first and hold that the Board's conclusion was adequately supported.

The Board stated:

> The Board concludes that the environmental and recreational loss to the public from the destruction and imperilment of the habitat is not outweighed by the economic, social, cultural, recreational, or other benefit to the public from the project. While the second homes will add to the tax base of the town, there is no evidence that the town needs the additional revenue. The Board is also not persuaded that the loss of the habitat will be outweighed by the social, cultural, or recreational benefit to the public from the additional 33 units in an area which is already predominated by second homes.

> On the other hand, the loss to the public from the destruction and imperilment of the deer habitat is significant. The deeryard on the Southview property is part of the last remaining deeryard in a 10.7 square mile watershed. There is only one other area in the entire 280–320 acre deeryard that provides as high quality softwood cover as the 44-acre shelter on the Southview property. This proposed project would destroy ten acres of critical habitat and, through the secondary impacts of people living in the homes, imperil

the remaining 34 acres. The existence of the deer in this area provides an opportunity to the public to hunt and to observe deer and provides the more intangible benefit of knowing that the deer exist. The loss of the deer in this area would be significant to the public who benefit from their existence.

■■ Southview complains that the Board ignored evidence showing that second homes throughout the state contribute more to the economy of the state than does deer hunting. But this evidence simply was not relevant. The subcriterion requires only a comparison of the relative benefits and losses of the particular project. And that comparison must not be restricted to economic data only; the statute requires that the Board assess the less tangible effects, which are not reducible to mathematical formulae. The Board properly undertook this task.

*Affirmed.*