## In re Petition of Town of Sherburne

[581 A.2d 274]

No. 89-076

Present: Morse, J., and Martin, Supr. J., Barney, C.J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed July 20, 1990

*Langrock Sperry Parker & Wool,* Middlebury, and *John H. Marshall* and *Dale A. Rocheleau* of *Downs Rachlin & Martin,* Burlington, for Appellants.

*Witten, Saltonstall & Woolmington, P.C.,* Bennington, for Appellees.

**Morse, J.** The Town of Sherburne and Killington, Ltd. appeal a superior court decision reversing a ruling of the Vermont Water Resources Board. The Board ruled that the existing classi-

fication of a 200-foot portion of the Ottauquechee River as Class B is contrary to the public interest. See 10 V.S.A. § 1253(c), (e). The superior court determined that the Board acted arbitrarily, unreasonably and contrary to law. See *id.* § 1270. We reverse and reinstate the Board's decision.

## I.

The Ottauquechee River flows through Sherburne Center, Bridgewater, Woodstock, Taftsville, and Quechee before it converges with the Connecticut River about forty miles from its headwaters. The river is managed according to the provisions of 10 V.S.A. chapter 47 and is classified under §§ 1252 and 1253 as both Class B and Class C waters at certain intervals along its length. The portion of the river at issue is currently managed as Class B waters.[1]

The Town of Sherburne has undergone extensive development in the past two decades. Sherburne is noted for ski areas that attract both state residents and nonresidents. Its population increases ten-fold during ski and recreational seasons. Most of the early housing developments in Sherburne were built with individual on-site sewage disposal facilities that have proven to be unsuitable for that area due to the soil's poor natural drainage. Some of these on-site systems have malfunctioned and threaten to pollute the waters at issue.

To permit continued growth, especially in "cluster" developments called for by town and regional plans, the Town proposed to construct and operate a central sewage disposal facility that would discharge effluents into the portion of the Ottauquechee River in question. Because the state's water pollution control scheme does not allow for the discharge of treated effluents into

---

[1] 10 V.S.A. § 1252 defines the classifications of state waters according to their suitable uses. Class B waters are defined as "[s]uitable for bathing and recreation, irrigation and agricultural uses; good fish habitat; good aesthetic value; acceptable for public water supply with filtration and disinfection." Class C waters are "[s]uitable for recreational boating, irrigation of crops not used for consumption without cooking; habitat for wildlife and for common food and game fishes indigenous to the region; and such industrial uses as are consistent with other class 'C' uses."

Class B waters,[2] the Town sought to reclassify the subject waters as Class C waters.

Accordingly, in late 1986, the Town petitioned the Board to reclassify a 200-foot portion of the river located within Sherburne Center. The Town requested that "the waters of the Ottauquechee River, from a point at the easterly side of Route #4 as it crosses above the river southerly of the confluence of Falls Brook and continuing downstream for a distance of 200 feet, be reclassified as Class C waters." The petition was submitted pursuant to 10 V.S.A. § 1253(c), which then required the Board first to determine whether the existing classification is contrary to the public interest.[3] See *In re Ranch Brook*, 146 Vt. 602, 606, 508 A.2d 703, 705 (1986). The Town contended in its petition

---

[2] The regulations adopted by the Board under 10 V.S.A. § 1252(c) provide: "The discharge of waste that contains pathogenic organisms prior to treatment is prohibited in Class A and B waters regardless of the degree of treatment provided." State Water Resources Board, Vermont Water Quality Standards § 1-04(A)(5) (1985). Discharge of such waste water into Class C waters could occur only if a discharge permit is obtained from the Agency of Natural Resources. 10 V.S.A. § 1263.

Section 1252(c) directs the Board to "adopt standards of water quality to achieve the purposes of the water classifications." The section has been amended since this dispute arose, and now mandates that state water quality standards establish limits for several specific criteria: "alkalinity, ammonia, chlorine, fecal coliform, color, lead, heavy metals, nitrates, oil and grease, dissolved oxygen, pH, phosphorus, temperature, and any other pollutants deemed necessary by the board." 1985, No. 199 (Adj. Sess.), § 5. New water quality standards were promulgated and approved effective January 8, 1987. The statutory amendment and the 1987 standards are not applicable in this appeal. See 1 V.S.A. § 214(b).

[3] At the time the petition was filed, § 1253(c) provided in part:

The board may on its own motion, and it shall upon petition by a state agency, a municipality or by thirty or more persons in interest alleging that it or they suffer injustice or inequity as a result of the classification of any waters, hold a public hearing convenient to the waters and area concerned and shall give all interested parties an opportunity to appear and be heard. If upon consideration of all the evidence submitted, the board finds that the established classification is contrary to the public interest it may by rule reclassify all or any portion to a higher or lower classification.

This section has been amended since the petition was filed, making clear that this initial determination, as well as any subsequent reclassification of the state's waters, is to be treated as part of a "rulemaking proceeding" under the Administrative Procedure Act, 3 V.S.A. ch. 25. 1987, No. 154 (Adj. Sess.), §§ 1 and 2.

that "it suffers injustice and inequity as a result of the established classification of the proposed Class C zone of the Ottauquechee River and . . . that the established classification . . . is contrary to the public interest," arguing that a central sewage treatment facility would provide for the orderly development of planned growth within the Town and would abate existing and potential pollution sources within the area.

The Board convened a public hearing on April 27 and 28, 1987, at which it heard testimony and admitted exhibits. In its extensive findings of fact and conclusions of law, the Board found, in sum, that "B" uses—namely, swimming, recreation involving extended water contact or ingestion, and public water supply—do not occur and will not be attained in the subject waters. The Board concluded that "[t]he current classification of the waters in question is contrary to the public interest in that it establishes water quality management goals that are inconsistent with existing and attainable uses." The Board announced in its decision that it planned to propose a rule reclassifying this section of the Ottauquechee as Class C waters. However, it is the decision that the existing classification is contrary to the public interest which is here appealed, not the reclassification rule which was later proposed and adopted by the Board.

The following parties, appellees here, filed an appeal in Rutland Superior Court pursuant to 10 V.S.A. § 1270[4]: Vermont Natural Resources Council, Connecticut River Watershed Council, North Hartland Cooperative Water Company, Trout Unlimited, Two-Rivers Ottauquechee Regional Planning Commission, Town of Bridgewater Planning Commission, Town of Bridgewater, and George Turner. On January 19, 1989, that court reversed the Board, holding that the Board had acted arbitrarily, unreasonably and contrary to law by failing to enforce

---

[4] Section 1270 permits an appeal to the superior court of the county in which the waters are located to "[a]ny person or party in interest aggrieved by any order or decision of the board." We do not address whether an appeal to the superior court was the proper route to obtain judicial review in this case or whether it remains the proper route after the amendment to 10 V.S.A. § 1253(c) expressly characterizing the "contrary to the public interest" hearing as part of a "rulemaking proceeding." See note 3, *supra*.

the legislation's antidegradation policy and to give "due consideration" to the ten factors enumerated in § 1253(e).[5] The present appeal followed.

## II.

This case arises in the context of a complex relationship between the federal and state water pollution control schemes. Congress enacted the Federal Water Pollution Prevention and Control Act (Clean Water Act), 33 U.S.C.A. §§ 1251–1387 (West 1986 & Supp. 1990), to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id.* § 1251(a). The federal scheme allows states to adopt water quality standards, provided the standards meet the approval of the United States Environmental Protection Agency and are at least as stringent as the federal standards.[6] *Id.* § 1313(a); 40 C.F.R. §§ 131.4, 131.5 (1989). In particular, states must adopt water uses consistent with the objectives of the Clean Water Act, and water quality criteria sufficient to protect those uses. 40 C.F.R. § 131.5(a)–(b) (1989).

Congress also mandated that states "develop and adopt a statewide antidegradation policy." *Id.* § 131.12(a); see also 33 U.S.C. § 1313(d)(4)(B). The antidegradation policy

---

[5] Prior to its 1988 amendment, § 1253(e) provided:

> In determining the question of public interest, the board shall give due consideration to:
> (1) existing and obtainable water qualities;
> (2) existing and potential use of waters for public water supply, recreational, agricultural, industrial and other legitimate purposes;
> (3) natural sources of pollution;
> (4) public and private pollution sources and the technological means of abating the same;
> (5) need for and potential use of mixing zones;
> (6) suitability of waters as habitat for fish, aquatic life and wildlife;
> (7) need for and use of minimum streamflow requirements;
> (8) federal requirements for classification and management of waters;
> (9) municipal, regional and state plans; and
> (10) any other factors relevant to determine the maximum beneficial use and enjoyment of waters.

[6] Because state regulations may impose more rigorous standards than the federal counterparts, state agencies should first look to the state regulations for guidance.

shall, at a minimum, be consistent with the following: (1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected[; and] (2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds . . . that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located.

40 C.F.R. § 131.12(a)(1)–(2) (1989).

The federal regulations distinguish between "designated uses" and "existing uses." A "designated use" is one that is specified in the state water quality standards regardless of whether it has actually been attained. *Id.* § 131.3(f). An "existing use" is one that has actually been attained on a given body of water after November 28, 1975. *Id.* § 131.3(e). This distinction is significant here because the regulations permit a state to reclassify waters and remove a designated use if the state demonstrates that attainment of the designated use is not "feasible" because, inter alia, "low flow conditions or water levels prevent the attainment of the use." *Id.* § 131.10(g).

The Vermont standards have been approved by the U.S. Environmental Protection Agency as satisfying the federal requirements. The general policy of the state is to manage the state's waters so as to protect, maintain, and improve water quality. Vermont Water Quality Standards § 1-02(A)(1). The state also recognizes that, although the discharge of wastes into waters may adversely affect water quality, such discharges are a legitimate use of waters when conducted according to law. *Id.* § 1-02(B). "It is the policy of the State of Vermont to provide for those legitimate uses of waters which are necessary for existing or future social and economic development . . . ." *Id.* Consistent with federal requirements, the state antidegradation policy seeks to maintain "[e]xisting instream uses and the level of water quality necessary to protect those existing uses," *id.* § 1-03(A), as well as to protect "high-quality" waters by allow-

ing "a limited reduction" in water quality only under certain circumstances, *id.* § 1-03(B).[7]

## III.

An appeal in the superior court from a decision of the Water Resources Board is to be "based solely upon the record of the proceedings before the board." 10 V.S.A. § 1270. The statute directs the superior court to "determine whether the board acted arbitrarily, unreasonably or contrary to law and [to] issue its findings and order accordingly."

■ Section 1270 also provides for appeals from the decision of the superior court to the Supreme Court, but does not clarify what standard of review should govern appeals in the Supreme Court. Because the superior court did not take evidence but functioned solely as an appellate body in this context, and because, unlike the Board, it has no special expertise on the question of water pollution and the management of the state's waters, we conclude that this Court's function on review in this case is the same as that specified for the superior court—that is, to determine whether the Board acted arbitrarily, unreasonably or contrary to law. This is consistent with the approach taken by other courts when there is an intermediate level of appeal from an administrative body. In *Sierra Club v. Marsh*, 769 F.2d 868, 871–72 (1st Cir. 1985), for example, the court reasoned as follows:

> [A] court of appeals review of a district court review of an administrative agency's record is an awkward legal animal. Are we to set aside such a district court decision only if it is "clearly erroneous"? Fed.R.Civ.P. 52(a). Or, are we to ignore the district court and simply conduct our own review of the administrative record? . . .

---

[7] A reduction is allowable only when:

The adverse economic or social impacts on the people of the state specifically resulting from the maintenance of the higher quality of the waters are substantial and widespread, and [a]re not warranted by the economic, social and other benefits to the people of the state resulting from the maintenance of such a higher level of water quality.

Vermont Water Quality Standards § 1-03(B)(1).

We believe our answer to this type of question should be practical. We should be more willing, or be less willing, to differ with a district court about the "reasonableness" or "arbitrariness" of an agency decision, depending upon the particular features of the particular case that seem to make a more independent, or a less independent, appellate court scrutiny of the administrative record appropriate. Where, for example, the district court's judgment turns on matters of fact that *it* has determined, or upon evidence presented by witnesses in court, or even upon lengthy district court proceedings in which knowledgeable counsel explain the agency's decisionmaking process in detail, we will show appropriate hesitation to overturn that judgment. But, where the district court simply reviews a set of agency documents and, applying the same legal standard as we apply here, reaches a particular legal conclusion about the "reasonableness" of an agency's action, we have greater legal freedom to differ with the district court's ultimate characterization of agency behavior.

(Emphasis in original; citations omitted.)

■ In the present case, accordingly, we do not review the superior court's decision with the degree of deference we usually pay a trial court when it has taken evidence and made findings of fact in the ordinary civil context under V.R.C.P. 52(a). Rather, as the superior court was charged to do, we also review the Board's decision. The statute simply gives parties two appeals, and the standard of review in each is identical: to determine whether the Board acted arbitrarily, unreasonably, or contrary to law.[8]

---

[8] There is dicta to the contrary in *In re Ranch Brook*, 146 Vt. 602, 508 A.2d 703 (1986), and *In re Airport & Pond Brooks*, 142 Vt. 458, 457 A.2d 635 (1983). Like the present case, *Ranch Brook* involved an appeal from a decision of the superior court reversing a ruling of the Water Resources Board to reclassify a brook from B to C waters. As if the appeal to the Supreme Court were from a civil bench trial, we stated: "On appeal, the superior court's findings will not be set aside unless shown to be clearly erroneous." 146 Vt. at 604, 508 A.2d at 704. We then affirmed after determining from a "review of the record . . . that the findings of the superior court are sup-

■ To determine whether the Board acted "arbitrarily," we must decide whether the decision makes sense to a reasonable person—even if the reviewing court might have weighed the factors differently. See *State Dept. of Taxes v. Tri-State Industrial Laundries, Inc.*, 138 Vt. 292, 294, 415 A.2d 216, 218 (1980). The Board has wide discretion over what weight to give the individual criteria and what conclusions to draw from them, so long as its conclusions are consistent with legislative and prior agency policy. Even if the record of the Board's proceedings contains conflicting evidence, the Board's finding on the issue will ordinarily be upheld. See *In re Southview Assocs.*, 153 Vt. 171, 178, 569 A.2d 501, 504 (1989); *In re Quechee Lakes Corp.*, 154 Vt. 543, 554, 580 A.2d 957, 963 (1990). But the Board must also explain its reasons for finding as it does; if it does not give reasons, its decision may appear arbitrary. See *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983); 5 J. Stein, G. Mitchell & B. Mezines, Administrative Law § 51.03, at 51–63 (1988) (although evidence relied upon by agency is substantial, other "evidence which detracts from that relied on by the agency might cause a finding of arbitrary and capricious action").

To determine whether the Board acted "unreasonably," 10 V.S.A. § 1270, we must look to whether the Board's factual findings are supported by substantial evidence as that concept is used in the field of administrative law. See 2 C. Koch, Adminis-

---

ported by the evidence." *Id.* On their face, these statements misapprehend our inquiry on review; it is the *Board* decision that should be affirmed if its findings are supported by the evidence and the decision is not otherwise arbitrary or contrary to law. We misconstrue the legislative scheme if we defer to the superior court, whether it has reversed or affirmed the Board.

However, *Ranch Brook* was correctly decided on the merits. We affirmed the superior court's reversal of the Board decision because the Board had failed to make findings or to determine whether the existing classification of Ranch Brook was "contrary to the public interest," as required by the statute—the Board, in short, acted contrary to law. *Id.* at 605–07, 508 A.2d at 705. No deference was actually paid the court, although we agreed with its conclusion.

In *Airport & Pond Brooks* this Court similarly stated that it would defer to the superior court's findings unless clearly erroneous, 142 Vt. at 460, 457 A.2d at 637, but our holding was based on a procedural error of the Board and in fact involved no review of the superior court action. *Id.* at 461, 457 A.2d at 637.

trative Law and Practice § 9.4, at 90–91 (1985). In past decisions, we have sometimes suggested that this standard of review is a shade different from the "clearly erroneous" standard used for reviewing trial court findings under V.R.C.P. 52(a). See, e.g., *In re Quechee Lakes Corp.*, 154 Vt. at 554 n.10, 580 A.2d at 963 n.10.[9] But see *In re Muzzy*, 141 Vt. 463, 469–70, 449 A.2d 970, 973 (1982); *Green Mountain Power Corp. v. Commissioner of Labor & Industry*, 136 Vt. 15, 21, 383 A.2d 1046, 1050 (1978) (substantial evidence test "differs little, if at all, from the 'clearly erroneous' test of V.R.C.P. 52(a)"). Such distinctions, however, are too abstract to be useful. The terms "unreasonable" and "clearly erroneous" both imply deference to the factfinder. The reviewing court is not permitted simply to substitute its judgment for that of the factfinder, although neither may it abdicate its responsibility to review—to the contrary, it must search the record and satisfy itself that the findings are supported.[10] As we stated recently in reviewing a decision of the Environmental Board:

> We will not disturb the Board's findings of fact if there is substantial evidence in the record to support them. The Board held a de novo hearing in this matter. It took testimony from numerous witnesses, assessed their credentials,

---

[9] *Quechee Lakes* contrasted the "substantial evidence" standard of review with what it called (following Professor Koch) the "classic formulation" of the "clearly erroneous" test, as set forth in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948): "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." The *Gypsum* formulation differs, however, from the "clearly erroneous" test under V.R.C.P. 52(a) as typically defined in our decisions. See, e.g., *Howard v. Maple Leaf Farm Assocs.*, 151 Vt. 555, 557, 563 A.2d 996, 997 (1989) ("We will not disturb the findings of the trial court if there is any credible evidence fairly and reasonably tending to support its findings."). It also differs from the formulation used since by the United States Supreme Court, see *Amadeo v. Zant*, 486 U.S. 214, 223 (1988), which "seems closer to the substantial evidence standard than that expressed in the *Gypsum* case." Koch, *supra*, at § 9.5 (Supp. 1990).

[10] Support in the record for an administrative agency's findings has always been required on review; we have never "written a blank check to agencies in their findings of fact and conclusions of law," as charged in a recent article. Goss, *Hear No Evil, See No Evil: In re Spencer and the Twilight of Judicial Scrutiny in Vermont*, 14 Vt. L. Rev. 501, 510 (1990).

weighed their opinions, and, based upon all the evidence before it, found the facts that support its judgment. We are an appellate court, not a fact-finding agency; we must defer to the Board when its findings are supported—even if the record contains contradictory evidence—and when its conclusions are rationally derived from its findings and based on a correct interpretation of the law.

*In re Southview Assocs.*, 153 Vt. at 177–78, 569 A.2d at 504 (citations omitted). The degree of support required in the record, however, is not clarified by mere recitation of the labels "unreasonable" or "clearly erroneous." See 5 K. Davis, Administrative Law Treatise § 29:27, at 456–57 (2d ed. 1984) (terms used to discuss scope of review are misleading, unclear and "useless in that a court so often recites a batch of verbiage and then pays no attention to what it has said in determining what to do"). It is perhaps impossible to identify a "quantum" of evidence that is sufficient under either standard; in practice, the level of deference will often depend on how technical or arcane is the subject matter of decision. Where an administrative body is deciding a highly technical matter, a reviewing court will defer more readily than where the issues in controversy are accessible to a generalist judge.

■ The determination of whether the Board acted "contrary to law" is perhaps the least difficult of the three standards to define. See *In re Ranch Brook*, 146 Vt. at 606, 508 A.2d at 705. While some deference may be given to an administrative agency's construction of its own enabling legislation or regulations, see, e.g., *In re Eastland, Inc.*, 151 Vt. 497, 500, 562 A.2d 1043, 1045 (1989), an agency has no discretion to ignore statutory policy. Thus, the Board must consider all the criteria required by its statute, although it retains discretion in determining the relative weight to give each criterion.

It is against these standards that we review the Board's decision.

## IV.

■ Appellees contend, and the superior court agreed, that the Board failed properly to consider all ten criteria under

§ 1253(e). While the Board must consider and make findings as to each factor, *In re Buttolph*, 138 Vt. 573, 574, 420 A.2d 859, 860–61 (1980), the statute does not require the Board to show that each factor militates against the public interest in order to conclude that, overall, the existing classification is contrary to the public interest. The Board's findings in this case explicitly address all the factors. Appellees' complaint, therefore, is with the methods used by the Board in its evaluation of, and the weight placed upon, particular criteria.

Unifying appellees' several claims is the general contention that the Board violated the federal and state antidegradation provisions when it determined that the current Class B status of the waters was contrary to the public interest. Four specific grounds for reversing the Board are urged: (1) that the Board failed to make the requisite finding that a reduction in water quality is "necessary to accommodate important economic or social development in the area in which the waters are located," 40 C.F.R. § 131.12(a)(2); (2) that it failed to admit certain evidence relevant to the water's degradation; (3) that it construed the term "existing uses" incorrectly; and (4) that the Board improperly assumed that future pollution sources would prevent the attainment of Class B designated uses even absent the proposed facility.

## A. *Finding of Necessity*

Appellees assert that the Board failed to make the required finding that reclassification was "necessary to accommodate important economic or social development." Under federal law, where the Board has determined that "the quality of the waters exceed[s] levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds . . . that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located." 40 C.F.R. § 131.12(a)(2).

It is not obvious that a reclassification from B to C necessarily constitutes a reduction in water quality, since the water quality criteria specified for B and C waters in the Vermont

Water Quality Standards are identical. Indeed, the Board concluded that "[t]he existing high quality of the waters in question will receive the same level of protection . . . regardless of whether the waters are designated as Class B or Class C." Board Decision, Finding 1(o).[11] Assuming that a reduction in quality would occur, however, we conclude that the Board made the requisite "necessity" finding.

■ In its analysis under § 1253(e)(9), the Board looked at applicable town and regional plans. It expressly found that the continued development of the Sherburne "service" area was in the public's interest. Scattered development, the Board found, is discouraged by the plans as an inefficient and unaesthetic land-use strategy which "increases the risk of water pollution." Board Decision, Finding 10(h). Moreover, area soils were found to be "poorly suited to subsurface sewage disposal," *id.* 4(d), and an alternative central disposal method, spray irrigation, was found to be infeasible, *id.* 11(d)–(j). The Board determined that the reclassification was necessary: "In order to achieve the goals expressed in all applicable municipal and regional plans that most new development be clustered rather than scattered, some provision for central sewage facilities within the region and the Town of Sherburne is necessary." *Id.* 10(t). Although the Board did not expressly find "necessity" under 40 C.F.R. § 131.12(a)(2), it is clear that the Board believed that any lowering of quality that might ensue from a reclassification would be

---

[11] Of course, if the proposed sewage facility were to malfunction, consequent effluent could reduce water quality. Maintenance of the B classification insures against that particular eventuality because no discharges of "waste that contains pathogenic organisms prior to treatment" are permitted in B waters. Vermont Water Quality Standards § 1-04(A)(5). A reclassification to C could thus cause, in the event of system failure, a degradation of water quality. In response, the Town and Killington assert that failure of present on-site systems will result in degradation if the plant is not built. Of course, the failure of any system for treating waste may lead to a degradation of state waters.

In addition, one witness testified that phosphorus concentration from a sewage plant would create "fuzzy rock syndrome," a growth of algae on rocks. Whether this testimony is evidence of degradation improperly ignored by the Board is an issue we do not reach, since we find that the Board implicitly justified any such degradation as necessary to achieve important social and economic goals.

justified as necessary to accommodate important public development goals. This conclusion is inescapable in light of Board Finding 1(m): "Discharges from malfunctioning on-site waste disposal systems in the South Sherburne area currently have an adverse impact on the quality of the Ottauquechee River. Such discharges are likely to increase in the future increasing bacterial and protozoan contamination from domestic wastes." In short, the Board found that the quality of the waters would deteriorate *without* the proposed sewage plant, and that the plant would *alleviate* these problems.

Appellees, however, charge the Board with "arbitrarily disregard[ing] local and state water management goals precisely to expedite certain types of land development in Sherburne." They argue that the Board rejected contrary town, regional and state planning related to water quality and used the classification process to make land use decisions. Though the Board acknowledged that the classification process is not intended to make land use decisions or to reconcile inconsistent strategies or policies, it found that the Town needs central sewage facilities to achieve the goals expressed in the applicable plans, a finding that is supported in the record.[12] The question of land use inevitably arises in the Board's inquiry under § 1253(e)(9).

---

[12] Indeed, the Sherburne Town Plan expressly states:

> If economically feasible, the construction of additional municipal or private sewage treatment systems or expansions of existing such systems might offer the opportunity to overcome many limitations placed on development which uses on-site disposal methods. In particular, a higher intensity of growth might be accommodated with greater assurance that surface and ground water would not be contaminated.

Sherburne Town Plan, Utility and Facility Plan § A(1) (1986).

The Rutland Regional Commission held a special meeting on April 21, 1987 to discuss the reclassification petition, and concluded in a "Position Statement" issued the following day: "The Rutland Regional Commission supports the Town of Sherburne's petition for reclassification of a portion of the Ottauquechee River from Class B to Class C, subject to compliance of the proposed discharge to the water resources board standards for the protection of water quality." The Commission noted that it favored proposed land use patterns in Sherburne "because they diminish the negative impacts of scattered development."

## B. *Downstream Impact*

Appellees next argue that the Board erred in refusing to hear evidence on the downstream impact on water quality caused by hypothetical discharges of the proposed facility. We disagree.

The Board correctly reasoned that at subsequent discharge permit proceedings, the Town would have to show that the quality of downstream waters would not be degraded below their classifications by effluent from the treatment plant. Board Decision, Finding 11(s). "Classifications are not sized to accommodate discharges. Rather, discharges must accommodate the existing downstream uses of the receiving waters and the classifications." *Id.* 11(r). The Board must be permitted to exercise reasonable discretion in limiting the scope of evidence offered before it. We believe that the Board's refusal to hear the proffered evidence as premature was within its discretion.

## C. *Existing Uses*

Third, appellees assert that the Board created a new standard for "existing uses" that is contrary to law. They maintain that the Board's definition of "existing uses" circumvents the federal requirement that states classify their waters to consider "recreation in and on the water." See 40 C.F.R. § 131.10(a) (1989). Although the record reflects evidence of recreation in and on the subject waters, the Board's narrow definition permitted it, according to appellees, to find that these uses were not existing uses. They insist that because some Class B designated uses are in fact existing uses of the subject waters, the Board is prohibited by federal law from reclassifying the waters. See *id.* §§ 131.10(g), 131.12(a)(1). Again, we disagree.

The legislature created the Board to protect, regulate, and control the water resources of the state in the public interest. 10 V.S.A. § 901. The Board was granted the power to regulate the classification of the state's waters and to establish water quality standards as provided by the terms of the relevant statutes. *Id.* § 905. In light of this broad delegation, the Board must be afforded some latitude in interpreting the legislation it is bound to implement. See *In re Eastland, Inc.*, 151 Vt. at 499, 562 A.2d at 1044.

The Vermont Water Quality Standards define "existing use" as "any beneficial use of water which provides important economic, social or other public benefits and which has occurred on a *frequent, regular or consistent basis* and any other use made of the water which is compatible with its classification." § 1-01(B)(11) (emphasis added). Class C waters are managed for "recreational or other water uses *in which contact with the water is minimal and where ingestion of the water is not probable.*" *Id.* § 3-04(A)(2) (emphasis added). The Class B designated uses include swimming and recreation. *Id.* § 3-03(A)(2). In our view, these definitional provisions are consistent with both federal law and the statutory descriptions of Class B and C waters set out in 10 V.S.A. § 1252. See footnote 1, *supra.*

▆ After reviewing the evidence, the Board found that none of the Class B designated uses were existing uses of the subject waters. It found no evidence to show that swimming or other "contact" recreation occurred on a frequent, regular or consistent basis. Board Decision, Findings 2(d), (e) and (h).[13] Our review of the record shows ample support for the Board's finding. In short, the Board could reasonably conclude that the evidence of minimal or infrequent recreation on these waters is compatible with a C classification.

The Board also found, based on substantial evidence, that Class B uses were not attainable in the subject waters. "The currently designated use of swimming and other forms of recreation where extended direct contact with, or the ingestion of[,] water is likely to occur, is not feasible because natural flow conditions and water levels in the waters in question prevent the attainment of such uses." *Id.* 8(i). The Board decision was thus also consistent with 40 C.F.R. § 131.10(g).

D. *Assessment of Future Development*

Finally, appellees maintain that the Board erroneously as-

---

[13] The Board did find, however, that upstream and downstream of the subject waters the river is used for "a wide variety of recreational purposes including fishing, boating, swimming and other forms of recreation in which extended periods of direct contact with, or ingestion of, the water normally occurs, including kayaking, rafting and tubing." Board Decision, Finding 2(c).

sumed future malfunctioning of individual on-site disposal systems in reaching its decision. The Board found: "The disposal of wastes from future public or private development could inherently result in sources of pollution which would prevent the attainment of swimming or public water supply to the extent that those uses are otherwise attainable." Board Decision, Finding 2(j). Appellees contend that the Board may consider only existing public and private pollution sources but not potential sources. See 10 V.S.A. § 1253(e)(4). This claim has no merit.

The Board properly assessed the effects of future pollution pursuant to § 1253(e)(2) ("existing and potential use of waters for . . . legitimate purposes"). Consideration of potential uses of water cannot proceed without consideration of potential pollution. Again, the Board must be given reasonable latitude in interpreting its own enabling legislation; its inquiry here is entirely consistent with the language and apparent intent of § 1253(e). While the Board cannot engage in baseless speculation regarding future pollution, here the record reflects substantial evidence that discharges from malfunctioning on-site systems are likely to increase in the future. Evaluating the harm from future sources of pollution is similarly consistent with the Board's obligation under federal law to consider the feasibility of attaining Class B designated uses that were not then existing. 40 C.F.R. § 131.10(g).

Appellees and the superior court are concerned that consideration of potential pollution would result in the reclassification of every Class B water affected by upslope development. Such pessimism is unwarranted. Pollution sources are but one factor of many the Board must evaluate in determining whether an existing classification is contrary to the public interest and whether to initiate a reclassification proceeding.

We conclude that the Board did not act arbitrarily, unreasonably, or contrary to law.

*The decision of the trial court is reversed and the decision of the Water Resources Board is reinstated.*