STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Application of Kevin Blakeman | } | Docket No. 167-8-05 Vtec |
|  | } |  |
|  | } |  |

Decision and Order

Appellant-Applicant Kevin Blakeman (Applicant) appealed from a decision of the Development Review Board (DRB) of the Town of Randolph, denying site plan approval for a nine-unit multi-family dwelling. Applicant entered an appearance and represents himself; Interested Persons Dan Baginski, Barbara J. Paulson, Margaret H. Harper, Helen L. Anaya, Robert C. McAdoo, Alan Heath, Julie Brill, and William J. Kevan appeared and represent themselves; the Town is represented by Peter M. Nowlan, Esq.

This appeal is on the record, as the Town has adopted and implemented the procedures necessary for on-the-record determinations pursuant to 24 V.S.A. §§4471 and 4472; so that the Municipal Administrative Procedures Act, 24 V.S.A. §§1201-1210, applies to this application. Section 1209(b) of the Municipal Administrative Procedures Act requires that "[f]indings of fact shall explicitly and concisely restate the underlying facts that support the decision. They shall be based exclusively on evidence of the record in the contested hearing." Section 1209(c), in turn, requires the conclusions of law in the decision to be based on the findings of fact. In an on-the-record appeal, the Court does not hold a trial to hear evidence; rather, the Court reviews the record of the proceedings before the DRB, including the documents provided to the DRB and the oral testimony presented at the DRB hearings. See, e.g., In re Appeal of Leikert, Docket No. 2004-213, slip op. at 2 (Vt. Sup. Ct., Nov. 10, 2004) (three-justice panel).

The factual findings of the DRB are not conclusive, but they are given great weight.

1

In an on-the-record appeal, the Court is required to determine if substantial evidence exists in the record as a whole, from which the factual findings of the DRB might reasonably be inferred. In re Petition of Town of Sherburne, 154 Vt. 596, 604–05 (1990); In re Appeal of French, Docket No. 98-7-01 Vtec (Vt. Envtl. Ct., Mar. 4, 2002). If there is conflicting evidence in the record, it is the DRB rather than the Court that is the body charged with weighing this evidence. See In re Appeal of Leikert, Docket No. 2004-213, slip op. at 2 (Vt. Supreme Ct., Nov. 10, 2004) (three-justice panel); Appeal of Doyle, Docket No. 100-5-02 Vtec (Vt. Envtl. Ct., Jan. 21, 2003). This requirement in an on-the-record appeal: that the findings of the tribunal be supported by substantial evidence in the record as a whole, is the required link between the evidence and the findings.

As we explained recently in In re Stagecoach Road 6-Lot Subdivision (Appeal of Wickart), Docket No. 238-11-05 Vtec, slip op. at 5 (Vt. Envtl. Ct., May 15, 2006), the DRB decision must "lay out the links between the evidence and the factual findings, and lay out the links between the factual findings and the conclusions. [A] DRB decision on the record must provide the links of reasoning between the record and the result, as well as having an adequate basis in the evidence in the record."

In the present case, the record consists of the audio recordings of the two hearings held on Applicant's application (the hearings at which evidence was taken on May 17, 2005 and June 21, 2005), as well as the portion of the hearing on July 18, 2005, at which Applicant requested reconsideration, together with Applicant's application materials and supporting exhibits, written comment letters and other written materials submitted by others for consideration by the DRB, the municipal plan and zoning regulations, and the DRB decision. The Court has listened to the complete audio tapes of all three hearings[1] and has

_____

[1] Please be advised that side two of the first tape of the evidentiary hearings is of a much poorer quality than are side one of the first tape and both sides of the second tape, although most of it would nevertheless be capable of being transcribed. To maintain on-

read all the written documents and plans provided in the record.

We note that, although the DRB's decision recites that the DRB relied on "observations made by the Board during" its site visit, no audio or video record was made of the site visit, nor were any photographs submitted from the site visit, and it therefore is not part of the record and cannot be considered by the Court. In addition, although some of the documents show the ownership of some of the nearby properties, and it is apparent from the discussion at the hearings that the DRB and all the participants knew the locations of neighboring houses, the only evidence in the record that puts the locations of neighboring houses before the Court is the page of four photographs[2] attached to Mr. Baginski's May 9, 2005 filing with the DRB.

The parties were given the opportunity to submit written memoranda of law containing their arguments regarding what they wished the Court to decide in this appeal. In addition, a so-called amicus curiae brief[3] was filed in support of Applicant by an organization entitled Citizens for Property Rights. The Court has fully considered the record and the parties' memoranda.

_____

the-record review, it is necessary that the recording equipment produce a recording that is capable of being transcribed.

[2] It appears from the location of the window frame and the corner of the house shown in two of those photographs that the site plan may fail to show the adjacent buildings within 200 feet of the proposed development, as required by the last sentence of the first (unnumbered) paragraph of §4.1 of the Zoning Regulations.

[3] While the Town is correct that no provisions exist in our procedural rules for the filing of briefs by non-parties, we have fully considered the legal arguments presented by the amicus brief as if Applicant himself had filed it. To the extent that either the amicus curiae brief or any party's written memorandum refers to facts not in the record, such facts were not considered by the Court because this is an on-the-record appeal in which the Court is limited to reviewing the record. See V.R.E.C.P. 5(h).

Procedural and Constitutional Issues

Applicant first argues that he did not have an opportunity before the close of the May 17, 2005 hearing to rebut evidence presented against his application. At the initial day of hearing, Mr. Blakeman and his representatives first presented evidence in support of the application to the DRB, and then the DRB heard from other parties regarding the application. By the time that the neighbors opposing the application had presented their evidence and comments, the time for the DRB to use the meeting room that evening had expired at 9:30 p.m. Because Mr. Blakeman had not had the opportunity to present any rebuttal evidence, and because the DRB had certain questions about the completeness of the application, the DRB Chair suggested that the DRB give Mr. Blakeman a list of questions for him to respond to before the next hearing, and adjourned the hearing to the next scheduled day of hearing on June 21, 2005. The DRB did not close the hearing and did not issue its decision after the first day of hearing; rather, it adjourned the hearing to June 21 expecting to take additional evidence from Applicant at the continuation of the hearing.

At the June 21 hearing, not only was Applicant given the opportunity to present rebuttal testimony, but he had the benefit of the DRB's written list of fourteen questions, which he had answered in writing. He had the opportunity to supplement his application and to present additional testimony in support of his application. It was not until the end of the evidence presented at the June 21, 2005 hearing that the DRB concluded the hearing and went into deliberative session to consider the application. Applicant therefore had ample opportunity to rebut the evidence submitted by the interested parties; there was no error in the DRB's holding the hearing over the course of two hearing dates.

Applicant also argues that the DRB has denied him any beneficial use of his property, resulting in an unconstitutional 'taking' of his private property without just compensation. OMYA, Inc. v. Town of Middlebury, 171 Vt. 532, 533 (2000). However,

4

even if Applicant's present proposal were to be denied, Applicant would not be denied all economically beneficial use of his land, as it remains in use for a single-family dwelling, a horse barn (or garage or storage) building, and a shed (or camp) building. In re: McDonald's Corp., 151 Vt. 346, 350 (1989) (landowner is not guaranteed the most profitable use of the property).

In any event, even if the present proposal were denied, it would remain possible that Applicant could qualify for approval for a multi-family building of fewer units (for example, containing the eight bedrooms for which sewer connections have already been approved), or even for the proposed building configuration but located elsewhere on the lot, or redesigned or with additional landscaping or screening to address the criteria on which it was denied. Therefore the DRB's denial of this particular proposal was not in and of itself an unconstitutional taking.

However, we must note that, while it is not at all inappropriate for the DRB to suggest that an applicant meet with neighbors in advance of submitting a proposal, to determine whether there are any areas of agreement or adjustment, Applicant is correct that a DRB cannot abdicate its responsibility to decide whether a particular project meets the standards of the ordinance based on whether the project's neighbors agree with it or not. All applications should be analyzed according to the standards in the ordinance, taking into account all the evidence.

Merits of the DRB Decision

The proposed project is described here to the extent necessary to provide a context for the Court's analysis below of whether the DRB's findings and conclusions on each of the site plan criteria were supported by substantial evidence in the record as a whole. The proposed project parcel is a 5.81-acre parcel of property on the northerly side of Sunset Hill

5

Road, in the Rural-5-acre (RU5) zoning district[4] of the Town of Randolph. The property is generally open and slopes down from an elevation of 1010 feet above sea level at its southeasterly corner near the road to an elevation of 960 feet above sea level at its northwesterly corner. An existing mobile home and large (32' x 80') horse barn or storage[5] building (labeled "garage" on the proposed site plan) are located approximately eighty feet from the road towards the westerly side of the property. Both structures are connected to a single septic leach field and are served by a water line from a spring located across Sunset Hill Road. Applicant proposes to retain the large horse barn or storage building. Applicant proposes to remove the mobile home after construction of the proposed multi-family building, but before the occupancy of the proposed multi-family building. Applicant proposes to remove a small shed (labeled "camp" on the proposed site plan) located approximately eighty feet from the road midway along the frontage of the parcel.

---

[4] There was some testimony in the record suggesting that, at the time the application was considered by the DRB, a zoning ordinance amendment was under consideration (based on recommendations in the municipal plan) to rezone some area of the northerly side of Sunset Hill Road within a new "Gateway Commercial" zoning district, but that the residents along the road were working to defeat this aspect of the proposal to leave both sides of the road in the RU-5 district. No party suggested that the zoning amendments had yet been proposed for public hearing; we note for the parties' and the Town's future reference that a DRB is obligated to consider applications under a proposed zoning ordinance (rather than under the then-current zoning ordinance), during the 150-day period following its initial proposal for public hearing. 10 V.S.A. §4449(d).

[5] This building is described on Applicant's application as a "barn/garage," and is described as "storage" under the heading of "Business Name (if applicable)." Applicant proposes this building to remain and to remain connected to the septic field. Other than to state in its findings that "[a]n existing horse barn (labeled as "garage") will remain," the DRB did not make any findings as to the proposed use of this structure or whether its existence makes the proposed multi-family dwelling a second principal use on the lot, or whether it is proposed to be accessory to the proposed multi-family dwelling, nor did any party raise that issue in this appeal.

Applicant holds an easement across neighboring property to connect the proposed project to an eight-inch municipal sewer line; Applicant proposes to extend the municipal sewer line onto his property to serve the proposed project. Applicant proposes on-site water for the building from a new well located downhill and approximately fifty feet from the northwest corner of the proposed building; no wellhead protection zone is shown on the site plan.

Applicant applied for site plan approval of a nine-unit multi-family dwelling to be located approximately seventy-five feet from the easterly side of the parcel, and set back approximately 160 feet from the road. No landscaping is proposed between the proposed project and the property to the east. The units are proposed to be rental units. Each unit is proposed to have two bedrooms. Each unit is proposed to have a one-car garage, with parking for a second car in tandem in that unit's driveway. In addition, the driveway for the building opens to a turnaround area at the rear (north end) of the building, where the dumpster is located. Applicant presented evidence that additional parking for the building would be available in that area; however, the DRB made no findings regarding the number of additional parking spaces available in that area. The proposed site plan does not demarcate the proposed parking spaces.

The design of the building is intended to mimic the vernacular Vermont architecture of a rambling farmhouse with an ell and an attached barn. The DRB found, supported by substantial evidence, that it "would blend into the general Vermont landscape." The building is proposed to be a total of 182 feet long, in three segments. Two units are proposed for the front (house) segment, which is fifty-two feet wide facing the road, two-and-a-half stories high, and has a driveway on each side. Four units are proposed for the gambrel-roofed central (ell) segment, which is twenty-eight feet wide (exclusive of a porch or colonnade) and one-and-a-half stories high, with each pair of units being served by a double-width driveway. Three units are proposed for the rear (barn) segment, which is

sixty feet wide and three-and-a-half stories high, with its garages and its entry at the lowest level of the building. The rear of the building is at a lower ground level than the front of the building. The DRB found, supported by substantial evidence, that "the height of the proposed structure (excluding chimneys and cupolas)" is 30½ feet at the southern end of the building and 41½ feet at the northern end of the building, but did not make a finding as to the average finished grade surrounding each distinct portion of the building.

Similarly to use categories such as hotels, offices, conference centers, and dormitories, multi-unit dwellings fall within a "permitted use" category for the RU-5 district, and therefore do not require conditional use approval from the DRB, but do require site plan approval because they are neither single-family nor two-family dwellings. §4.0 of the Zoning Regulations. To obtain site plan approval, the proposal must meet all four of the criteria in §4.1(a)-(d) of the Zoning Regulations. The DRB denied site plan approval based on the proposal's failure to meet subsections (a), (b) and (d) of §4.1. As only Applicant appealed, and as Applicant understandably did not raise issues in his Statement of Questions regarding the criterion on which the DRB approved his application, we do not further examine the DRB's findings on or conclusion that the proposal met §4.1(c), which requires that "the proposed use and layout will be of such [a] nature that it will not make vehicular or pedestrian traffic hazardous."

Site Plan Review Criterion 4.1(a)

Section 4.1(a) provides that the "proposed use, design, and layout shall meet the provisions of the Zoning Ordinance and other Regulations and Ordinances of the Town and shall meet the intent of the Town Plan."

As to the proposed use, the DRB did not make a specific finding or conclusion, but no party contests that the use category of 'multi-family dwelling' is a permitted use in the district. Therefore, the proposed type of use as a multi-family dwelling by definition meets

8

the requirements of the Zoning Ordinance. This is not to say that therefore all multi-family dwellings, no matter how many units or on how small a lot, must be approved in any district in which multi-family dwellings are a permitted use category. Rather, to be approved, any proposed multi-family dwelling must also satisfy this site plan criterion with regard to its particular design and layout, and must also satisfy the other site plan criteria as to its effect on traffic safety, the development of the surrounding area, and the use of adjacent land.

The DRB made findings supported by substantial evidence that the proposed design and layout of the building meets the lot size,[6] setback, building coverage, and parking requirements of the Zoning Ordinance.

As to the proposed height of the building, the site plan proposes that "all structures are less than 35' high above mean ground level," although the district's height requirements are that the building not exceed 30 feet. §6.4.2. The DRB's only finding as to the building's height was that it was 30½ feet at the southern end of the building and 41½ feet at the northern end of the building, exclusive of chimneys and cupolas. Pursuant to §5.17.7, the height limitation is to be applied separately to each distinct portion of the building, but the DRB did not make a determination has to how any segment of the proposed building meets the height requirements of the ordinance, defined in §1.3.12 as "the vertical distance from the average finished grade surrounding the building to the highest point of the roof." If the DRB applied the provision in §5.17.7 that "the building height limit . . . may[7] be increased . . . by one (1) foot for every two (2) feet by which such

---

[6] The DRB noted that the Zoning Regulations lack a minimum-lot-area-per-dwelling-unit requirement for the RU-5 zoning district; see §5.17.6.

[7] If this provision applies to allowing an increase in the height of a building when larger-than-required setbacks are provided, it is not clear whether it is at the discretion of the DRB or at the option of an applicant, nor whether there is meant to be any upper limit

9

building . . . lies inside the nearest limiting line of any required front, side or rear yard," it should have so stated and made the required findings and calculation.

The DRB made findings supported by substantial evidence that the proposed building fails to meet the provisions of the Sewer Ordinance, that the soils on the project site are not suitable for septic systems so that the project would need to be connected to the municipal sewer, and that Applicant lacked approval to connect any more than eight bedrooms to the municipal sewer. These findings were sufficient to support the DRB's conclusion that the proposal failed to meet site plan criterion §4.1(a) because "the project does not meet the provisions of the Town Plan nor the Randolph Sewer Ordinance as it has not yet been approved for connection to the public sewer for a total of 9 units and 18 bedrooms."

As well as making findings that the project does not meet the provisions of the Sewage Ordinance, the DRB made additional findings not relied upon in the conclusions for site plan criterion 4.1(a). These findings (numbered 7 and 8): that the other properties on Sunset Hill Road are all single family homes except for the adjacent property to the west used by the Trimount Foundation as a retreat during the summer and on weekends, and that the proposed project has a much larger building footprint and many more residents than that the other properties on Sunset Road, are supported by substantial evidence in the record as a whole. However, while the DRB quoted Land Use goal 1 and Housing goal 4 from pages 17 and 65 of the Town Plan, the DRB failed to make findings on the "intent" of these or other sections of the Town Plan or to reach a conclusion on whether the size of the proposed building or the number of units in the project met or failed to meet the "intent" of the Town Plan.

_____

to the potential increased height. That is, if on a large lot a building is set back two hundred feet more than required, is it the applicant's option for it to be a ten-story (100-foot-tall) building?

10

Nevertheless, because the DRB's conclusion that the project does not meet site plan criterion §4.1(a) was only based on the project's lack of approval for connection of the remaining ten bedrooms to the municipal sewer, and not on the other aspects of the Town Plan, we need not here address whether its findings could have supported a denial for that reason, and need not address whether the "intent" of the plan is sufficiently defined to support the regulatory provision. Compare In re: Appeal of Agnes Mitchell Trust, Docket No. 47-4-01 Vtec , slip op. at 6-7 (Vt. Envtl. Ct., Feb. 26, 2002) (citing Kalakowski v. John A. Russell Corp., 137 Vt. 219, 225-26 (1979)) (nonregulatory statements in a town plan are not enforceable unless specific zoning or subdivision regulations implement those statements). See also In re Molgano, 163 Vt. 25, 30-31 (1994) (under Act 250, zoning bylaws must be used to interpret the meaning of a town plan, to avoid giving "nonregulatory abstractions" in the town plan the "legal force of zoning laws.")

Site Plan Review Criterion 4.1(b)

Section 4.1(b) provides that the "proposed use, design, and layout will be of such a location and in such size and character that it will be in harmony with the appropriate and orderly development of[8] the surrounding area." (Emphasis added.)

The DRB made findings supported by substantial evidence that the proposed building is proposed for an area (Sunset Hill Road) in which thirteen of the fourteen

---

[8] We note that, although at the hearing some participants discussed whether the project was consistent with the "character of the area" or the purposes of the RU-5 zoning district, that phrase only appears as a criterion applied to conditional use approval, imposed by the state statute, 24 V.S.A. §4414(3), even though it is not stated in the conditional use section of the Zoning Regulations (§3.4.1). In any future proceedings under the present Zoning Regulations, the DRB should take care to review multi-family dwellings in this district only under the site plan criteria, not under the conditional use criteria, as they are not classified as conditional uses in this district.

11

developed properties are single-family homes, ten of which are occupied year-round and the largest of which has a footprint of approximately 2,100 square feet; and that the footprint of the proposed building is approximately 6,700 square feet and would increase the year round-occupancy on the road from ten units to nineteen units.

The DRB then concluded that because of this difference in the size and number of units in the proposed building, the proposed project failed to meet §4.1(b). However, without findings on what would be the "appropriate and orderly development" of the surrounding area, the DRB's findings are not sufficient in and of themselves support the DRB's conclusion that the proposal failed to meet site plan criterion §4.1(b). That is, the DRB would have needed to have made findings that the "appropriate" near-future development for the Sunset Road area would only be single-family houses or agriculture, despite the fact that two-family and multi-family dwellings, as well as other larger residential uses such as hotels, conference centers, and dormitories, are permitted uses in the district. In connection with this task, it may be appropriate for the DRB to consider the description of the area in the municipal plan, as well as the purpose statement and allowed uses in the district, to make a determination of what type of development would be appropriate[9] for a particular area.

Site Plan Review Criterion 4.1(d)

Section 4.1(d) provides that the "proposed height and location of buildings or structures, walls, and fences, parking, loading and landscaping shall be that it will not

---

[9] Indeed, although not directly applicable to the present case, it is useful to note that the statutory definition of character of the area, as used in the conditional use criterion, 24 V.S.A. §4414(3)(ii), explicitly refers to the character of the area as being defined by the purposes of the zoning district and the "specifically stated policies and standards of the municipal plan." That is, it is not necessarily the area as it may now exist, but as it is intended to be if the municipal plan and zoning regulations were to be carried out.

interfere with or discourage the appropriate development in the use of land adjacent to the proposed site or unreasonably affect its use."

In light of the over-forty-foot height at the north end of the structure, the thirty-foot height at the south end of the proposed structure, the slope of the land, and the proximity of the building to the boundary line of the property to the east, and the photographs from that property looking to the west, there is substantial evidence in the record for the DRB to find that Applicant's proposal would "dramatically interfere" with the westerly view from the neighboring property to the east.

Moreover, the DRB made findings supported by substantial evidence that the proposed location and orientation of the building result in maximizing the detrimental effect of the building on the neighboring property, that it will result in excessive noise, disturbance and the potential for odor, that headlights from vehicles entering the garage for Unit 2 on the easterly side of the multi-family building would shine into the adjacent house to the east, and that will therefore interfere with and unreasonably affect the easterly neighbors' use of their property. These findings were sufficient to support the DRB's conclusion that the proposal failed to meet site plan criterion §4.1(d).

On the other hand, the record lacks substantial evidence to support a finding that the proposed project would cast a shadow onto the easterly neighbors' garden to an extent that would unreasonably interfere with their use of their property, as there was no evidence and no finding on the hours of sunlight on that garden or on the degree to which a building to the west of the garden would affect the garden. This is not to say that the evidence does or does not exist, or that it could or could not have been inferred by the DRB members during their site visit; it is only to say that such observations must be made part of the record, and findings on them must be made, in order to allow an on-the-record judicial review of the decision.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the DRB's July 18, 2005 decision denying site plan approval of Appellant-Applicant's proposed nine-unit multi-family dwelling is AFFIRMED, as substantial evidence exists in the record from which the DRB could conclude that Applicant did not satisfy the criteria required to grant site plan approval under §4.1(a) and (d) of the Zoning Regulations.

However, this decision is specifically without prejudice to Applicant's future submission to the DRB of this or a redesigned or revised application, either after the requisite sewer connections have been approved,[10] and/or by redesigning at a smaller scale and/or in a different location on the property, and/or with different or additional proposed landscaping or screening. This decision concludes this appeal; any future appeal from a future decision by the DRB would be a new appeal an would receive a new docket number.

Done at Berlin, Vermont, this 19th day of June, 2006.

_____
Merideth Wright
Environmental Judge

---

[10] Please note that an appeal of any action taken by the Selectboard on Applicant's application for approval of sewer connections for additional bedrooms would be appealable, if at all, to the superior court under V.R.C.P. 74 or 75, rather than to Environmental Court.